**UNITED STATES of America and Douglas MacGregor, Senior Team Coordinator, Petitioners,**

v.

**CHEVRONTEXACO CORPORATION, Respondent.**

**No. 3:01–CV–04243.**

United States District Court,
N.D. California.

Sept. 12, 2002.

---

Jay Weill, San Francisco, CA, for Petitioners.

Anthony de Alcuaz, McDermott Will & Emery, Palo Alto, CA, Michael F. Kelleher, McDermott Will & Emery, Washington, DC, Peter Van Mieghem, McDermott Will & Emery, Palo Alto, CA, for Respondent.

## ORDER ADOPTING FINDINGS AND RECOMMENDATIONS OF MAGISTRATE JUDGE

CHESNEY, District Judge.

Before the Court are petitioners' and respondent's respective objections to and motions for de novo determination of Magistrate Judge Wayne D. Brazil's March 25, 2002 Report and Recommendation Re In Camera Review and petitioners' objections to and motion for de novo review of Magistrate Judge Brazil's June 18, 2002 Report

and Recommendation Re Supplemental Submissions.

Having read and considered the above-referenced reports and recommendations and the papers filed in support of and in opposition to the objections and motions, the Court finds the matter appropriate for decision on the papers, VACATES the hearing scheduled for September 6, 2002, and, with one exception,[1] hereby adopts in their entirety Magistrate Judge Brazil's findings and recommendations as set forth in the initial report of March 25, 2002, as supplemented and amended by the report of June 18, 2002.

This order closes Docket Nos. 34, 38 and 54.

**IT IS SO ORDERED.**

## REPORT AND RECOMMENDATION RE *IN CAMERA* REVIEW

BRAZIL, United States Magistrate Judge.

### I. *Introduction*

The IRS has petitioned the District Court to compel Chevron Texaco Corporation ("Chevron") to produce roughly 180 documents that Chevron claims are protected by the attorney-client privilege and/or by the work-product doctrine. *See,* Verified Petition to Enforce Internal Revenue Service Summons, filed November 14, 2001.

On January 24, 2002, the District Court referred the matter to a Magistrate Judge for *in camera* review. This court received the assignment on January 29, 2002. Pursuant to this assignment, we ordered Chevron to produce the documents for *in*

---

1. Magistrate Judge Brazil found document 32 is protected by the work product doctrine. (*See* Report filed March 25, 2002 at 26.) Respondent concedes that document 32 is not protected by the work product doctrine. (*See* Response to Petitioners' Objections to Report and Recommendation filed April 22, 2002 at 8: 5–6.) Accordingly, the Court finds document 32 is not protected by the work product doctrine.

*camera* inspection. On February 15, 2002, we received three large binders of documents. On February 20, 2002, we received a supplemental letter brief from the IRS, and on February 28, 2002, we received a response to that letter from Chevron. We then commenced our *in camera* review.

We have reviewed all of the pertinent papers that the parties have filed and have examined *in camera* all the documents which Chevron asserts are protected from disclosure. We address in separate sections, below, Chevron's invocation of the attorney-client privilege and its assertion of work product protection. As will become clear, a substantial number of documents that are not insulated by the attorney-client privilege nonetheless fall within the reach of the work product doctrine.

## II. *ATTORNEY–CLIENT PRIVILEGE*

Chevron asserts that almost all of the 180 documents are protected by the attorney-client privilege.[1]

The burden of proving that the privilege applies lies with the party asserting the privilege. *Weil v. Investment/Indicators Research & Management,* 647 F.2d 18, 25 (9th Cir.1981). The privilege protects communications between an attorney and her client made in confidence for the purpose of securing legal advice from the lawyer. *U.S. v. Chen,* 99 F.3d 1495, 1501 (9th Cir.1996).

At the outset, we note that the privilege protects *communications,* not

underlying evidence. Moreover, it is widely accepted that the privilege encompasses not only (qualifying) communications *from* the *client* to her attorney but also communications *from* the *attorney* to her client in the course of providing legal advice.

The case before us presents some difficult questions about application of the privilege. Here, the client is a corporation (Chevron). The legal advice Chevron sought pertains to a business transaction. The in-house attorneys charged with providing legal advice about the business transaction also were instrumental in implementing that transaction. Moreover, in this case, in-house counsel did not simply render legal advice about the transaction and then turn to implementation. Counsel rendered legal advice throughout the process of structuring and implementing the transaction. Because the purported privileged communications involve attorneys who apparently performed the dual role of legal and business advisor, assessing whether a particular communication was made for the purpose of securing legal advice (as opposed to business advice) becomes a difficult task. In addition, the fact that these in-house attorneys "wore two hats" raises questions about who should be deemed, for purposes of privilege analysis, the "client" in any particular communication.

There are five general types of communications that Chevron claims are protected by the attorney-client privilege: (1) communications between a Chevron em-

1. Chevron's privilege log is ambiguous in this regard. In the column titled "Privilege Reason" Chevron often states "Recording of attorney legal analysis and work product." We would have assumed that by stating "recording of attorney legal analysis" Chevron is claiming that the document is opinion work product. However, since Chevron then writes *"and* work product," we assume, for purposes of our *in camera* review, that by

stating "recording of attorney legal analysis" Chevron actually intends to invoke the attorney-client privilege.

Additionally, in connection with several documents, the log states "recording of attorney legal analysis" but does not state "and work product." For those documents, we assumed Chevron is invoking the protections afforded both by the privilege and by the work product doctrine.

ployee and Price Waterhouse, (2) communications between a Chevron employee and Chevron's outside counsel, (3) communications between Chevron's in-house counsel and one or more Chevron employees who are not attorneys, (4) communications between two or more Chevron in-house attorneys, and (5) communications between "nonlegal" Chevron employees in which the employees discuss or transmit otherwise privileged communications (*e.g.*, legal advice from counsel).

██ Privilege disputes have generated a hearty body of case law. The legal principals that emerge from these authorities, however, often are only in the nature of general guiding statements. The challenge has been to determine how to apply these general legal principals to the complex facts of our case. Our response to that challenge has been to focus on the primary purpose that justifies the privilege. "The privilege is intended to encourage *clients* to be *forthcoming* and candid with their attorneys so that the attorney is sufficiently well-informed to provide sound legal advice." *U.S. v. Adlman*, 68 F.3d 1495, 1499 (2nd Cir.1995) (emphasis added); *In re Fischel*, 557 F.2d 209, 211 (9th Cir.1977). Because the privilege is in derogation of the truth-finding process and must be strictly construed, we concluded that the privilege should attach only where extending its protection would foster more forthright and complete communication between the attorney and her client *about the client's legal dilemma*. *Weil*, 647 F.2d at 24 (privilege strictly construed).

Chevron might fail to satisfy its burden with respect to any particular communication for one or more of three reasons:

- Chevron and/or its attorneys did not maintain the confidentiality of the communication;

- the communication consists of or relates to business advice, as opposed to legal advice; and/or

- the document for which Chevron asserts the privilege does not contain or reveal a communication between attorney and client.

## A. *Communications Made To or From or Shared with Price Waterhouse*

The evidence in the record as well as the documents reviewed *in camera* support a finding that Price Waterhouse, in the context of an ongoing relationship with Chevron, proposed to Chevron the business transaction that is the subject of the withheld documents. The documents also support a finding that Chevron personnel, most of whom are attorneys, discussed, among other things, the structure, the purpose and the tax consequences of the transaction at length with Price Waterhouse. Furthermore, our *in camera* review clearly established that Price Waterhouse conducted extensive *legal* analysis with respect to the tax consequences of the proposed transaction.

Chevron asserts that the attorney-client privilege encompasses communications between Chevron employees and Price Waterhouse, *as well as communications between Chevron and its lawyers that Chevron shared with Price Waterhouse*, where the communications were made or shared for the purpose of securing legal advice.

The privilege protects communications between a *client* and *its attorney*. As a general rule, the privilege does not extend to communications between either the client or its attorney and a third party.[2]

---

2. There are some well accepted exceptions to this rule. For example, the privilege will

protect communications made by the client to

Chevron contends, however, that *U.S. v. Kovel*, 296 F.2d 918 (2nd Cir.1961), extends the privilege to communications involving Price Waterhouse. More specifically, according to Chevron, *Kovel* extends the protection offered by the privilege to communications between a third party, on one hand, and the client or its attorney, on the other, where that third party is either the client's agent or the attorney's agent and "the communications are made in confidence to facilitate the provision of legal services by the attorney to the client." Response to Government's Reply to Memorandum in Support of Respondent's Response to Order to Show Cause, filed January 24, 2002 ("Response") at 6.

Chevron also contends that otherwise privileged communications between it and its attorneys that were shared with Price Waterhouse do not lose their privileged status because they were shared within the *"Kovel"* relationship. *See,* Chevron letter brief, dated February 28, 2002, filed March 1, 2002 at 2–3.

The IRS, on the other hand, contends that Chevron reads *Kovel* too broadly. *Kovel,* the IRS argues, does not extend the privilege to all discussions with third parties enlisted to help the attorney develop her legal advice. According to the IRS, *Kovel* reaches communications involving a third party only where that third party is enlisted to "translate" the client's communications so that the attorney can understand them, or is enlisted to "interpret" the client's situation or data in order to make that situation or data understandable by the lawyer. Stated another way, the attorney and/or client must have enlisted the third party in order to facilitate com-

prehension by the lawyer of communications or information from the client.

While we are not bound by the Second Circuit's opinion in *Kovel,* we elect to follow Kovel *as elaborated by U.S. v. Ackert,* 169 F.3d 136 (2nd Cir.1999).[3] This reading of *Kovel* aptly serves the purpose underlying the privilege (facilitate consultation) without unduly impinging on the truth finding process.

The Second Circuit's holding in *Kovel* is based on an analogy to the role of a foreign language translator. The Second Circuit finds that "accounting concepts are a foreign language to some lawyers" and an accountant may act to "interpret" the "client's story." *Kovel,* 296 F.2d at 922. "[C]ommunications ... reasonably related to *that* purpose ought [to] fall within the privilege." *Id.,* (emphasis added).

█ *Kovel* finds that "the presence of the accountant is *necessary* or at least *highly useful,* for the *effective consultation* between the client and the lawyer which the privilege is designed to permit." 296 F.2d at 922 (emphasis added). The interpreter analogy and the statement that the accountant is needed to facilitate the client's *consultation* both strongly indicate that *Kovel* did not intend to extend the privilege beyond the situation in which an accountant was interpreting the client's otherwise privileged communications or data in order to enable the attorney to understand those communications or that client data. *Accord, Judson, supra,* 322 F.2d at 462 (accountant's document protected where "[t]he accountants' role was to *facilitate an accurate and complete con-*

---

the attorney's ministerial employees (e.g., secretary, paralegal).

**3.** At least two Ninth Circuit opinions cite *Kovel* with approval. *U.S. v. Judson,* 322 F.2d 460, 462 (9th Cir.1963) (privilege may extend

to document prepared by accountants that describes client's financial affairs in order to enable attorney to understand client's financial situation); *U.S. v. Gurtner,* 474 F.2d 297, 299 (9th Cir.1973).

*sultation* between the client and the attorney about the former's financial picture") (emphasis added).

*Kovel* also states,

If what is sought is not legal advice but only accounting service, ... or if the advice sought is the accountant's rather than the lawyer's, no privilege exists.

*Kovel,* 296 F.2d at 922. With this language, *Kovel* explicitly excludes the broader scenario in which the accountant is enlisted merely to give his or her own *advice* about the client's situation. Tax questions are so closely governed by the Revenue Code and by IRS and Tax Court rulings about the meaning of the Code that an accountant's advice will be "legal" in the sense that it is based in statute and interpretations of statutes. Therefore, we think the above-quoted statement precludes extension of the privilege where the accountant is hired merely to give additional legal advice about complying with the tax code even where doing so would assist the attorney in advising the client. *Accord, Ackert,* 169 F.3d at 139 ("a communication between an attorney and a third party does not become shielded by the ... privilege solely because the communication proves important to the attorney's ability to represent the client"); *U.S. v. Adlman,* 68 F.3d 1495, 1500 (2nd Cir. 1995) ("If .. Sequa furnished information to AA [Arthur Anderson] to seek *AA's expert advice on the tax implications* of the proposed transaction, no privilege would apply") (emphasis added).

■ Chevron does not even contend that Price Waterhouse served in the more limited "translator" function contemplated by *Kovel.* Moreover, neither the declarations submitted by Chevron in support of its position nor the contents of the subject documents would support a finding that Chevron retained Price Waterhouse in connection with the CEMCO transaction in order to put *Chevron's* communications or information "into terms that [its in-house counsel] can use effectively." *In re Bruce Lindsey,* 158 F.3d 1263 (D.C.Cir.1998).

To the contrary, Chevron clearly states that its in-house counsel had "significant expertise," that *its in-house counsel* undertook legal analysis of the issues, and that based thereon Mr. Marsh, Chevron's General Tax Counsel, advised Chevron. Declaration of Bruce Marsh, filed January 24, 2002, ("Marsh Decl."), at ¶ 11–12. By Mr. Marsh's own statements his team of seasoned attorneys needed no assistance in *understanding* Chevron's communications or financial situation. Furthermore, Mr. Marsh makes it clear that Price Waterhouse was retained to assist Chevron in "analyzing the tax legal issues." Marsh Decl. at ¶ 11. "[Price Waterhouse was] intended to assist my attorneys and me in *evaluating the legal merits* of the transaction." Marsh Decl. at ¶ 14 (emphasis added). As just stated, we reject the view that *Kovel* encompasses such a relationship.

For the above reasons, we RECOMMEND that the District Court find that *Kovel* extends only to communications with third parties that are necessary to effectuate the client's consultation. We also RECOMMEND that the District Court find that Price Waterhouse did not serve in the capacity contemplated by *Kovel* and, therefore, that communications between Chevron and/or its attorneys, on the one hand, and Price Waterhouse, on the other, do *not* constitute *confidential attorney-client* communications. Finally, we RECOMMEND that the District Court find that Chevron and its attorneys failed to maintain the confidentiality of any otherwise privileged communications shared with third party Price Waterhouse. Based on our review of the privilege log Chevron asserted *Kovel*-based protection for the

following documents: 2–15, 18, 40, 41, 45, 47, 48, 54, 86, 95–135, 137–166.[4]

Although Chevron does not contend that Price Waterhouse served as an "interpreter" with respect to any of the communications at issue, our recommended findings do not preclude the possibility (as a matter of law) that some particular question put to Price Waterhouse was within the scope of the privilege as we have circumscribed it. *E.g., Ackert,* 169 F.3d at 140. Accordingly, the court reviewed each document for which Chevron asserted protection associated with *Kovel* in order to determine whether in any particular instance Price Waterhouse acted within a *Kovel* capacity. We found none.

Because we recommend the District Court find that the element of confidentiality has not been maintained with respect to communications involving Price Waterhouse, we do *not* decide, here, whether each communication involving Price Waterhouse was made for the purpose of seeking legal, as opposed to business, advice. In the event that the District Court declines to accept our recommendations with respect to Chevron's *Kovel* claims additional *in camera* review would be re-

quired in order to satisfy ourselves that each communication allegedly protected by *Kovel* satisfies the requirement that it be made for the purpose of seeking *legal* advice.[5]

*Of course,* our recommended finding that the privilege protects no communications for which Chevron asserted *Kovel*-based protection does not compel disclosure of those documents. Chevron also contends that the protection of the work product doctrine reaches the majority of such documents. We discuss that doctrine in a separate section, *infra.*

## B. Communications Exchanged Between Chevron and Chevron's Outside Counsel

▮ Communications between a client and its outside counsel are presumed to be made for the purpose of obtaining legal advice. *Chen,* 99 F.3d at 1501 (rebuttable presumption that lawyer is hired to give legal advice); *Diversified Industries, Inc. v. Meredith,* 572 F.2d 596 (8th Cir.1977).

Many of Chevron's communications with its outside counsel, Pillsbury, Madison & Sutro, were made or received by Chevron's in-house counsel. As previously not-

---

4. Document 13 contains "marginalia" by Mr. Chigbu. Chevron has not satisfied its burden of demonstrating that either the underlying document or the marginalia is/are privileged. Chevron has not submitted evidence that would support a finding that the marginalia reflect *communications* or that Mr. Chigbu *communicated* those notes to Chevron. Moreover, at least some of the marginalia suggests that Mr. Chigbu communicated these notes to third party Price Waterhouse (*e.g.,* notes at bottom of page CM0000044). In addition, document 19 is a copy of documents 125 and 138 with marginalia by Mr. Chigbu. Again, Chevron has *submitted no evidence* that would support an inference that Mr. Chigbu's notes reflect *confidential* attorney client *communications.*

Chevron also shared document number 29 with third party Goldman Sachs. It is the court's understanding that Chevron has withdrawn its privilege claim with respect to document 29.

5. We can state, however, that this court would find that at least one document, the October 11, 1996 memorandum by Stacey Lucas, (documents 4, 98, 156, 160, and 166) is almost entirely nonlegal and, therefore, would not otherwise be protected by the privilege. If the District Court declines to accept our recommendation that Chevron failed to maintain the confidentiality of this document by sharing it with third party Price Waterhouse, we would recommend that the District Court compel production of this document except for the first sentence ("This ... activities.") and the final portion of a sentence on the third line of the last page ("and .... be.").

ed, in-house counsel may serve in either a legal or a business capacity. Thus, depending on the circumstances and the content of the communication, lawyers employed in the office of Chevron's corporate counsel could be cast in the role of "attorney-legal advisor" with respect to some communications or in the role of "Chevron-client" with respect to other communications. The IRS does not argue to the contrary. The corporation may designate a representative to speak on its behalf to outside counsel. There is no apparent reason why in-house counsel cannot serve as that representative. In fact, in-house counsel may be the corporate employee who is the most well-suited to understand, digest, and apply outside counsel's legal advice. Treating in-house counsel as the client with respect to communications for Chevron with outside counsel serves the purpose underlying the privilege by facilitating the corporation's ability to consult with its outside legal advisors.

It appears that the following documents constitute, contain or reflect communications between Chevron and its outside counsel, Pillsbury Madison & Sutro: 28, 28A, 28B, 28C, 51, 52, 53, 54, 55, 56, 57, 58, 59, 70, 71, 72, 73, 84, 85, and 86. In addition, document 176 reflects communications with Chevron's former outside counsel, Groom & Nordberg.

Whether such communications are protected by the privilege depends on wheth-

er Chevron and its counsel properly maintained their confidentiality. We address that question separately for identified documents in the paragraphs that follow.

■ Documents 54, 58 and 86 constitute, reflect or contain communications that were also shared with a third party, Price Waterhouse. Because we have concluded that no *Kovel* relationship existed between Chevron and Price Waterhouse for purposes of these communications, we also conclude that Chevron has not maintained confidentiality with respect to the communications encompassed by those documents. Accordingly, we RECOMMEND the District Court find that the attorney-client privilege does not protect documents 54, 58 and 86.

Chevron has broken down document 28 into four discrete e-mails: 28, 28A, 28B, and 28C. Addressing each e-mail separately does not accurately reflect what was communicated with that e-mail because each (chronologically) successive e-mail apparently attached those that preceded it.[6] For example, it is true, as Chevron's privilege log indicates, that 28C standing alone appears to contain a privileged communication. However, our review of these e-mails indicates that that otherwise privileged communication was sent to Suzanne Greenberg of Goldman Sachs.[7] Therefore, Chevron and its counsel failed to maintain the confidentiality of the e-mail Chevron

---

**6.** With respect to each series of e-mails for which Chevron asserts protection under the privilege, Chevron breaks the series down into each discrete e-mail message. In our view, such a representation of the documents is misleading. Each e-mail / communication consists of the text of the sender's message *as well as all of the prior e-mails that are attached to it.* Therefore, Chevron's assertion that each separate e-mail stands as an independent communication is inaccurate. What is communicated with each e-mail is the text of the e-mail and all the e-mails forwarded

along with it. If an e-mail with otherwise privileged attachments is sent to a third party, Chevron loses the privilege with respect to that e-mail *and all of the attached e-mails.*

**7.** We acknowledge that the list of addresses for 28C does not include Ms. Greenberg. However, based on our reading of 28B, Ms. Greenberg's e-mail, she was responding to 28C. Therefore, it is the court's view that what Chevron has labeled document 28B actually consists of both 28B and 28C.

has labeled 28C. Accordingly, Chevron has waived the privilege with respect to 28C. Nor does the attorney-client privilege protect 28B, an e-mail to Chevron *not* from its counsel but from third party Goldman Sachs. It follows that Chevron would be required to produce documents 28C and 28B unless one or both are insulated by the work product doctrine—a matter we address in a separate and subsequent section of this Report and Recommendation.

The e-mail labeled "28" and the e-mail labeled "28A" (along with any prior e-mails to which each writer was responding or referring) contain privileged communications. Chevron and its attorneys appear to have maintained the confidentiality of these communications.

Documents 51–58 reflect another series of e-mails. From what the court can tell, the discrete e-mails described initially at 52, 53, and 54 have been redacted or withheld throughout the series of documents. The e-mail that appears to have started the exchange, labeled 54, was copied to Price Waterhouse. As stated above, in our view, Chevron and its attorneys failed to maintain the confidentiality of that communication by sharing it with third party Price Waterhouse. Therefore, Chevron should produce the e-mail labeled 54.[8] The e-mails described at 52 and 53 on the log are privileged communications that Chevron appears to have maintained as confidential. Unless fairness requires a subject matter waiver (a topic we discuss *infra*), documents 51 through 58 should be produced with only the e-mails that are initially described as 52 and 53 redacted. Documents 84–86 contain the same series of e-mails at issue in 51–58 and should be produced or withheld consistent with the recommendation just stated. As indicated

in footnote 6, any e-mails produced by Chevron must include not only the text of the sender's message but also all prior e-mails attached thereto.

Documents 59 and 70 contain privileged communications and we see no evidence that Chevron failed to maintain their confidentiality.

▮ Documents 71, 72, and 73 contain another series of e-mails. The e-mail labeled 73 must be produced in part. In our view, the third paragraph (starting *"How do we ...."*) is a business communication and must be produced. The mere fact that outside counsel was copied with the e-mail will not shield communications not made for the purpose of securing legal advice. All other paragraphs in that e-mail may be redacted. E-mails 71 and 72 *and* any e-mails that were attached to them (except the third paragraph of 73 which must be produced) contain apparently confidential privileged communications.

Document 176 reflects privileged communications with Chevron's former outside counsel, Groom & Nordberg and may be withheld.

## C. *Chevron's Internal Communications*

Documents that Chevron maintained internally may constitute, contain, or reflect the following three kinds of communications: (1) communications between Chevron's in-house counsel and one or more Chevron employees who are not attorneys, (2) communications between two or more Chevron "in-house" attorneys, and (3) communications between nonlegal Chevron employees.

---

8. According to the privilege log, Chevron does not claim protection under the work-product doctrine with respect to e-mail 54.

 As noted above, communications between a corporation and its outside counsel are presumed to be made for the purpose of seeking *legal* advice. However, as already stated, unlike outside counsel, in-house attorneys can serve multiple functions within the corporation. In-house counsel may be involved intimately in the corporation's day to day business activities and frequently serve as integral players in business decisions or activities. Accordingly, communications involving in-house counsel might well pertain to business rather than legal matters. The privilege does not protect an attorney's business advice. Corporations may not conduct their business affairs in private simply by staffing a transaction with attorneys. *Fischel,* 557 F.2d at 211. Because in-house counsel may operate in a purely or primarily business capacity in connection with many corporate endeavors, the presumption that attaches to communications with outside counsel does not extend to communications with in-house counsel. *Accord, U.S. v. Chevron Corp.,* 1996 WL 264769, *4 (N.D.Cal.1996).

 With respect to internal communications involving in-house counsel, Chevron must make a "clear showing" that the "speaker" made the communications for the purpose of obtaining or providing legal advice. *In re Sealed Case,* 737 F.2d 94 (D.C.Cir.1984). In order to show that a communication relates to *legal* advice, the proponent of the privilege must demonstrate that the "primary purpose" of the communication was securing legal advice. *Chevron Corp.,* 1996 WL 264769. Extending protection to communications primarily and sufficiently animated by some other purpose would not be necessary to encourage forthright disclosures by clients to lawyers—so such communications should not be privileged.

In this case, the business transaction that is the subject of the communications was motivated largely by Chevron's desire to reduce its tax liabilities. It appears that how the transaction was structured would affect the way the IRS treated it for tax purposes. Chevron called on its in-house counsel (and Price Waterhouse) to assess the tax consequences attendant to the various ways Chevron could structure the transaction.

 Determining the tax consequences of a particular transaction is rooted virtually entirely in the law. The advisor must analyze the tax code, IRS rulings, decisions of the Tax Court, etc. Communications offering tax advice or discussing tax planning or the tax consequences of alternate business strategies are "legal" communications. *Accord, In re Grand Jury,* 731 F.2d 1032, 1037–1038 (2nd Cir.1984). We realize that corporations often enlist the services of nonlawyers (*e.g.,* accountants, consulting firms) to advise them with respect to tax matters. This does not change the fact that the advise is rooted in the law and, *when solicited from or given by a client's attorney* it constitutes *legal* advice as contemplated by the attorney-client privilege.

Nonetheless, where, as here, the attorneys not only served as legal advisors but also helped implement the business transaction, we cannot simply assume that every communication involving in-house counsel that related to this transaction was made primarily for the purpose of securing legal advice.

 It is clear that communications between corporate personnel and their in-house counsel made for the purpose of securing legal advice are protected by the privilege. *E.g., Chen,* 99 F.3d at 1502. Moreover, as noted above, in-house attorneys may constitute the "client" for purposes of a corporation's communications

with its outside counsel. What is less clear from the authorities is whether communications between two or more in-house attorneys may qualify as an *attorney-client* communication.

██ Again, the realities of corporate structure are such that an in-house attorney may be charged *both* with assessing the legal aspects of a transaction and implementing that transaction. Because, in this way, in-house counsel operate in both a legal and a business capacity, it is our view that an in-house attorney may act as the "attorney" for purposes of one communication and as the "client" for purposes of another. Where, as in the case before us, the lawyers serve both business and legal functions, it seems to us consistent with the fundamental policies that drive privilege doctrine to treat an in-house lawyer communicating with another in-house lawyer both as lawyer and as client. In our view, that communication (when made in order to secure legal advice) constitutes an *attorney-client* communication for purposes of applying the privilege. *Cf., U.S. v. Rowe*, 96 F.3d 1294 (9th Cir.1996) (law firm partner in effect hired associates to provide legal services for the firm). We also acknowledge that privilege can attach to communications from one lawyer for a party to another lawyer for that same party—at least if the communication from the one lawyer reflected earlier communications from the client or if the communication from the first lawyer to the second lawyer was made in the expectation that the substance of that communication would be shared with the client.

The final category of communications that we are called upon to evaluate involves communications between two or more nonlegal employees. It seems to us that there are two types of these communications that the privilege might protect. The privilege might protect a communica-

tion between nonlegal employees in which the employees discuss or transmit legal advice given by counsel. Such communications obviously reveal privileged communications. The IRS does not appear to dispute that the privilege may reach communications of that type.

The second type of communication that the privilege might protect is a communication between nonlegal employees in which an employee discusses her intent to seek legal advice about a particular issue. According to the IRS, the privilege does not extend to such communications. Government's Reply to Memorandum in Support of Respondent's Response to Order to Show Cause . . ., filed January 11, 2002, at 6–7.

██ Materials, transmitted between nonlawyers, that reflect matters about which the client intends to seek legal advice are comparable to notes a client would make to prepare for a meeting with her lawyer—notes which could serve as an agenda or set of reminders about things to ask or tell counsel. It would undermine the purpose of the attorney-client privilege not to extend protection to such notes. Therefore, internal communications that reflect matters about which the client intends to seek legal advice are protected.

With these views in mind, we now determine whether the privilege extends to the remaining documents.

### *E-mail*

Documents 1, 42, 83, 87, and 178 are copies of an October 5, 1998, e-mail from in-house counsel Charles Johnson. We RECOMMEND the District Court find that this e-mail constitutes a privileged communication *except* as follows. In our view, Chevron must produce the first bullet point and "Action Item (1)" because Chevron has not maintained confidentiality

as to the statements made therein. The document indicates that these matters were discussed with third party Goldman Sachs and that further disclosures to Goldman Sachs about these matters would occur. Chevron has not maintained the confidentiality of these communications and manifests a clear intent to make further disclosures on that subject. Additionally, Chevron must disclose the second bullet point and "Action Items (3) and (7)." These communications consist of purely business matters.[9]

Documents 30, 31, 43–45, 60–69, 74–82, 88, 90, 92, 93, and 167–175 also reflect e-mails that Chevron asserts are protected by the attorney-client privilege.

E-mails 30 and 30A constitute attorney-client communications made for the purpose of securing and/or rendering legal advice and, therefore, are protected by the privilege.

The privilege does not protect e-mails 31, 31A or the chart communicated via e-mail labeled 31B except for the third to last sentence in Mr. Haley's e-mail (beginning with "Also …"). That one sentence may be redacted. In our view, these communications (other than the redacted sentence) consist of purely business matters. These communications were not made primarily, if at all, for the purpose of seeking legal advice. The contents of these communications are purely financial. They reflect factual information used to implement the transaction.

Documents 43 and 82 reflect the same e-mail. As we understand it, Chevron has produced document 82 in redacted form. Assuming this is true, the court agrees with Chevron's assessment that the redacted portion reflects privileged communications.

Next we address e-mails 44, 45, 45A, 45B, and 45C. As we understand its privilege log, Chevron has separately produced the e-mails labeled 44 and 45. However, in our view, because it appears e-mail 44, when sent, attached e-mail 45 (to which it was a response), Chevron must produce e-mails 44 and 45 together on one page so that it accurately represents the entire communication. We accept Chevron's claim of privilege with respect to e-mails 45A, 45B, and 45C.

The e-mails Chevron has labeled 59–67 reflect nine e-mails messages. It appears that each new message forwarded as attachments each prior e-mail. Having reviewed each e-mail independently and as an attachment to subsequent e-mails this court accepts Chevron's claim that the privilege protects documents 59–67.[10] Documents 74–81 reflect the exact same e-mail sequence and also are protected.

Similarly, Chevron has demonstrated that documents 68 and 69 reflect privileged communications.

The privilege also protects documents 88 and 90 (the same e-mail).

The privilege protects the e-mails Chevron labeled 92 and 93.

Chevron has labeled another series of e-mails as documents 167–175. Some of the e-mails in this series have been produced in redacted form (i.e., attached e-mails have been redacted). In our view, the attorney-client privilege protects the redacted materials.

### Handwritten Notes

The next group of documents we address contain handwritten notes. Documents 16, 21–25, and 34–39 are the hand-

---

**9.** Chevron did not claim that these documents were protected as work product.

**10.** Document 59 also was addressed in section B above.

written notes of Mr. Chigbu, an in-house attorney.[11] Mr. Chigbu's handwriting is only intermittently legible. The court is not required to spend hours deciphering illegible handwriting. We cannot determine whether these notes contain or reveal any attorney-client communications.[12] Chevron has submitted no declaration from Mr. Chigbu deciphering his writing, stating whether his notes reflect discussions from meetings or his own private thoughts, or, if the notes reflect meetings, who the participants in those meetings were and what the purpose of the meeting was. In effect, Chevron has submitted no evidence that would assist the court in determining whether the privilege was properly asserted with respect to these notes. *U.S. v. Osborn*, 561 F.2d 1334, 1339 (9th Cir.1977) (proponent of privilege failed to meet burden where no affidavit set forth circumstances of document's creation). Accordingly, the court finds that Chevron has not established that these documents are privileged.

Documents 32, 91, 177, and 180 consist of handwritten notes by various other Chevron employees. Document 32 contains handwritten notes by Stacey Lucas, an in-house attorney. Based on our review, these notes reflect discussions at a meeting attended by third party Price Waterhouse. In fact, most of the notes seem to be descriptions or paraphrases of statements (communications) made *by Price Waterhouse*. These communications are not privileged. Again, Chevron did not submit a declaration from Ms. Lucas substantiating the content of her notes. Based on our review, none of the statements in the notes reflect attorney-client communications. Accordingly, Chevron

has not supported its claim that document 32 is protected by the attorney-client privilege.[13]

Chevron produced document 91, notes by Kathy Carnavale, in redacted form. The notes relate to a meeting at which all of the participants were employees (attorneys and nonattorneys) of Chevron or CEMCO. The redacted material reflects privileged communications.

Document 177 reflects notes from a meeting. The redacted material appears to reflect an otherwise privileged communication. However, Chevron has set forth no evidence from which the court could determine who participated in the meeting. If Price Waterhouse or another third party was present at the meeting, Chevron would not have maintained the confidentiality of this otherwise privileged statement. Because Chevron has not satisfied its burden with respect to document 177 (and because Chevron asserts no other basis for protection) Chevron must produce document 177 in its entirety.

Document 180 consists of notes by a Chevron employee, Mr. Crowe, that reflect his discussion with Mr. Jones, another Chevron employee. Although neither Mr. Jones nor Mr. Crowe is an attorney, Mr. Jones was the liaison between legal and corporate on the CEMCO project. *See,* Marsh Decl. at ¶ 10. It appears from Mr. Crowe's notes that Mr. Jones was relating tax advice. Thus it appears that Chevron has established that document 180 reveals attorney-client communications and is privileged.

### Miscellaneous

Documents number 17 and 33 are copies of a meeting agenda. We accept Chev-

---

**11.** *See also,* footnote 4.

**12.** Mr. Chigbu's notes are examples of log entries in which Chevron stated "recording of attorney legal analysis." *See,* footnote 1.

**13.** Chevron did not claim that this document is protected by work product.

ron's representation that this document was exchanged only between Messrs. Johnson and Chigbu. Because we acknowledged that in-house counsel may be both counsel and client where, as here, the attorney is responsible both for rendering legal advice with respect to and implementing a transaction, we find that this agenda constitutes a privileged attorney-client communication made for the purpose of securing and/or rendering legal advice.

Documents 20, 26, 27, and 46 are variations on the same document. The court RECOMMENDS the District Court find that the privilege attaches to each document with respect to the outline. It appears that the outline was initially prepared by a Chevron employee for transmission to in-house counsel for the purpose of seeking legal advice (documents 20 and 46). In-house counsel then appears to have refined that client communication and transmitted it to another in-house attorney for the purpose of securing and/or rendering legal advice (documents 26 and 27). Document 27, however, includes marginalia by Mr. Chigbu. Again, Mr. Chigbu's notes do not appear to reflect attorney-client communications (as opposed to his own private thoughts, which are likely attorney work product). Therefore, with respect to document 27, the attorney-client privilege protects the outline but not Mr. Chigbu's notes.

Documents 49, 50 and 94 are slightly different versions of the same memorandum. Documents 49 and 50 contain handwritten notes that appear to be by different people. A Chevron attorney drafted the memorandum and sent it to another Chevron attorney. In our view, transmission of the memorandum itself is an attorney-client communication. Additionally, the content of the memorandum appears to reflect client communications made for the purpose of securing tax-legal advice with respect to the proposed transaction. The underlying memorandum is privileged. Chevron has not, however, submitted evidence that would permit the court to find that the marginalia on versions 49 and 50 contain or reflect communications—as opposed to the private thoughts of counsel. Thus, while the marginalia may be covered by the work product doctrine, Chevron has failed to show that they are protected by the attorney-client privilege.

The sentence redacted from document 89 reflects an attorney-client communication.

Document 179 consists of a communication among nonlegal employees. Chevron has produced the document but has redacted several sentences. The redacted material does not reveal a communication that already occurred between attorney and client. Instead, it appears that the redacted material reflects matters about which the client intended to seek legal advice. They are protected.

Chevron has asserted that many of the documents discussed above are independently protected by the work product doctrine. We consider these assertions in the next section.

### III. WORK PRODUCT DOCTRINE

Chevron asserts that 100 documents sought by the IRS are eligible for the qualified immunity afforded under the work product doctrine.[14]

■ Chevron bears the burden of establishing that the materials it seeks to

**14.** Chevron initially asserted that 125 documents were eligible for protection under the work product doctrine. Chevron later conceded that the following 25 documents did not qualify for such protection: 19, 29–31,42–45, 51–58, 68, 69, 82–87 and 178.

protect are documents prepared "in anticipation of litigation" by or for Chevron or by or for Chevron's representative. *See,* Fed.R.Civ.P. 26(b)(3) and (5). *See also, Resolution Trust Corp. v. Dabney,* 73 F.3d 262, 266 (10th Cir.1995). If Chevron demonstrates that the protection afforded by the work product doctrine extends to the documents it has withheld, the IRS may overcome the doctrine's qualified immunity (with respect to non-opinion work product) if it can show that it has a "substantial need" for the documents and that it is unable to otherwise obtain the "substantial equivalent" of the withheld materials without "undue hardship." Fed.R.Civ.P. 26(b)(3). The court, however, must "protect against disclosure of the mental impressions, conclusions, opinions, or legal theories [so-called "opinion" work product] of an attorney or other representative [of Chevron]." *Id.*

At this juncture in the proceedings this court is called on to decide only whether Chevron has made a showing sufficient to support a finding that the protections of the work product doctrine can extend to the various documents submitted for *in camera* review. No occasion has arisen for the IRS to contend that its competing needs justify penetration of the qualified immunity. Therefore, we do not now decide whether the work product doctrine will ultimately protect the withheld documents from disclosure to the IRS.

■ We must remain mindful of the distinct purpose underlying this doctrine. "At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." *United States v. Nobles,* 422 U.S. 225, 238, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975). The doctrine creates a "zone of privacy" in which the attorney is encouraged to write down her litigation

theories and strategies without fear that her opponent will unfairly capitalize on her work and creativity. *United States v. Adlman,* 68 F.3d 1495, 1501 (2d Cir.1995); *Hickman v. Taylor,* 329 U.S. 495, 510–11, 67 S.Ct. 385, 91 L.Ed. 451 (1947).

As stated in Rule 26, the doctrine extends not only to work by the attorney but also to litigation preparation work by the party or its representatives. The protection afforded by the work product doctrine "prevent[s] exploitation of a party's efforts in preparing for trial" by preventing the opposing party from obtaining trial preparation materials absent a clear showing of otherwise unsatisfiable need. *Admiral Ins. Co. v. United States Dist. Court for the Dist. of Ariz.,* 881 F.2d 1486, 1494 (9th Cir.1988); *Hickman,* 329 U.S. at 516, 67 S.Ct. 385 (Jackson, J., concurring) (doctrine prevents one side from "perform[ing] its functions . . . on wits borrowed from the adversary").

In the case at bar the work product dispute centers around whether or not the withheld documents were prepared "in anticipation of litigation."

The parties advocate the use of different court-created "tests" designed to determine whether a document was (in whole or in part) created "in anticipation of litigation."

According to the IRS, the court should determine whether a document was prepared or obtained in anticipation of litigation by focusing on the "primary motivating purpose" for its creation. Government's Reply, at 14. Under this test, the work product doctrine extends to a document only if the "primary motivating purpose behind the creation of the document was to aid in possible future litigation." *United States v. Davis,* 636 F.2d 1028, 1040 (5th Cir.1981). The IRS also contends that under this test

"a document analyzing an anticipated or possible litigation is not work product if the primary motivating force behind its preparation was to assist in a business decision." Government's Reply, at 15. In the IRS' view, the doctrine does not reach withheld documents prepared "to assist a business decision *or to assess tax consequences* of a transaction." Government's Reply, at 15 (emphasis added).

In contrast, Chevron asks us to follow the test set forth in *United States v. Adlman*, 134 F.3d 1194 (2d Cir.1998). Under this test, the court will deem a document to have been prepared in anticipation of litigation "if 'in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained *because of* the prospect of litigation.'" *Id.* at 1202 (*quoting Wright & Miller, 8 Federal Practice & Procedure* § 2024, at 343 (1994) (emphasis in original)). *Adlman* reads Rule 26(B)(3) broadly. "Nowhere does Rule 26(b)(3) state that a document must have been prepared *to aid* in the conduct of litigation in order to constitute work product, much less *primarily or exclusively* to aid in litigation. Preparing a document 'in anticipation of litigation' is sufficient." *Adlman*, 134 F.3d at 1198 (emphasis in the original). Furthermore, the Second Circuit continues, "work product protection should not be denied to a document that analyzes expected litigation merely because it is prepared to assist in a business decision." *Id.*, at 1199. On the other hand, *Adlman* instructs, the "because of" test "withholds protection from documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation." 134 F.3d at 1202.

In our view, the Second Circuit's test better serves the purposes driving the work product doctrine. An attorney's (or a party's) reasoning or research (factual or legal) about anticipated litigation should not be discoverable simply because the work also had to be undertaken to facilitate or consider a business transaction. The expectation of litigation is either real or it is not. Whether the party prepared for that litigation before conducting a transaction (to inform its business affairs) or implemented the transaction "in the dark" and then prepared for the litigation that would surely arise from it does not alter the imminence or "realness" of the expectation of litigation. Additionally, refusing to protect litigation analyses prepared prior to implementing a transaction will discourage parties from making every effort to structure their deals in unobjectionable ways (to the extent possible) and could needlessly increase litigation.

 Thus we agree with the Second Circuit that, except where a document would have been generated in the normal course of business even if no litigation was anticipated, the work product doctrine can reach documents prepared "because of litigation" even if they were prepared in connection with a business transaction or also served a business purpose.

We accept Chevron's general assertion, supported by competent declarations, that the proffered anticipation of litigation was real. The evidence submitted by Chevron supports a finding that, from the start, Chevron reasonably believed that it was a virtual certainty that the IRS would challenge the CEMCO transaction. According to Mr. Marsh, Chevron's General Tax Counsel, the IRS examines all of Chevron's tax returns. Marsh Decl. at ¶ 13. Moreover, the CEMCO transaction involved a very substantial amount of tax dollars, and the IRS had previously questioned similar transactions. Marsh Decl. at ¶ 13. In addition, Mr. Marsh states

that Chevron would not have hired Price Waterhouse but for the imminence of litigation with the IRS. Marsh Decl. at ¶ 11. Chevron has shown that Price Waterhouse was acting as its agent when Price Waterhouse prepared the documents in issue here and that it was because Chevron and Price Waterhouse anticipated a vigorous legal challenge by the IRS to the formation of CEMCO that many of the documents were prepared.

For analytical purposes we have divided the universe of documents that we might encounter here into the following categories:

(1) documents reflecting *legal analysis* of the CEMCO transaction by a lawyer, or other Chevron agent;

(2) documents connected to the CEMCO transaction that were prepared or obtained at the time litigation was expected and that either,

 (a) appear to reflect or be borne out of reasoning about strategies or analyses connected with the anticipated litigation, or

 (b) appear only to reflect the logistics or mechanics of implementing business concepts; or

(3) documents simply prepared during the period in which litigation was anticipated but that have no appar-

ent connection to the transaction at issue.

Based on our *in camera* review, none of the documents Chevron withholds fit into category three.

### A. *Documents Reflecting Legal Analysis*

██ Documents that consist of legal analyses by Chevron, its attorneys or another representative with respect to anticipated litigation by the IRS are clearly protected by the work product doctrine. This type of document was at issue in *Adlman.* 134 F.3d at 1199 ("Rule [26(b)(3) ] takes pains to grant special protection to the type of materials at issue in this case—documents setting forth legal analysis").

The court finds that the following documents or portions of documents consist of analyses of the anticipated litigation:

5, 6 (CM0000010–CM0000011), 7–13, 14 (CM0000061–CM0000097), 15–18, 20 (CM0000189–CM0000191), 21–25, 26 (CM0000215–CM0000217), 27 (CM0000224–CM0000227), 28, 28A, 28B, 28C, 32–41, 48 (CM0006113–CM0006114),[15] 49, 50, 91(redacted portion), 94, 96 (PM0000236–PM0000237), 99–104, 111 (PM0000388–PM0000424), 113, 114, 115 (PM0000808–PM0000809), 116–124, 125 (Redact Handwritten

---

**15.** There are three distinct apparently unrelated documents that comprise number 48. However, Chevron's privilege log describes only the first document, a Memo drafted on 1/26/1998 by Robert Bradley for Warren Glettner and others discussing the overview of the liability management company structure. Number 48 of the log makes no reference to the other two documents, the first drafted by Warren Glettner for Stacy Lucas and others on 4/11/1996, and the second drafted by Stacy Lucas for John Gegner and others on 10/11/1996. The second and third documents do appear on the privilege log under numbers 3, 4, 97, 98, 155, 156, 159, 160, 165 and 166, but in each of those instances Chevron *does not* seek protection for these documents under the work product doctrine. Given this inconsistency in Chevron's privilege log and confusion surrounding the presence of these two documents in number 48 (in part from Chevron's failure to mention these documents at number 48 on the privilege log), we assume that Chevron does not assert that the work product doctrine extends to the second and third documents in number 48 (which are also documents 3, 4, 97, . . . 166).

Notes),[16] 127 (PM0000917–PM0000953), 128 (PM0001000–PM0001036), 129–135, 136 (PM0001216–PM0001217), 137, 138 (Redact Handwritten Notes),[17] 139–42, 144, 145 (PM0001326–PM0001362), 146, 147, 148 (PM0001418–PM0001449), 149–52, 154 (PM0001527–PM0001528), 157 (PM0001557–PM0001558) and 161–63.

## B. *Business/Litigation Documents*

■ As indicated above, there are two types of documents which can fall into the category of documents prepared for both a business and litigation purposes: those that appear to reflect or be borne out of reasoning about strategies or analyses for litigation, or those that appear only to reflect the logistics or mechanics of implementing business concepts. In our view, the test articulated by the Second Circuit in *Adlman* reaches the former but not the latter. Documents that were prepared because of anticipated litigation might include, for example, discussions about alternative ways to structure the transaction where those alternatives reflect thinking about the IRS' expected reaction to and treatment of the deal. In contrast, documents that reflect only the logistics or mechanics of implementing business concepts will not, on their face, reflect reasoning about the anticipated litigation and do not appear to be informed by concerns about that litigation. With respect to this type of document, Chevron's business needs clearly would necessitate creation of the document. These documents were prepared in the "ordinary course of business or . . . would have been created in essentially similar form irrespective of the litigation." 134 F.3d at 1202.

We RECOMMEND the District Court find that the following documents or portions of documents reflect or reveal or were borne out of reasoning about strategies or analyses connected with anticipated litigation and are eligible for protection under the work product doctrine:

6 (CM0000012–CM0000013), 14 (CM0000101–CM0000106), 20 (CM0000178–CM0000188), 26 (CM0000209–CM0000214), 27 (CM0000218–CM0000223), 44–47, 48 (CM0006115–CM0006116), 95, 96 (PM0000238–PM0000239), 105–110, 111 (PM0000425–PM0000430), 112, 115 (PM0000810–PM0000811), 126, 127 (PM0000957–PM0000962), 128 (PM0001040–PM0001045), 136 (PM0001218–PM0001219), 143, 145 (PM0001366–PM0001371), 148 (PM0001453–PM0001458), 153, 154 (PM0001529–PM0001530), 157 (PM0001559–PM0001560) and 180.

The following documents or portions of documents appear to reflect only the logistics or mechanics of implementing the business project and would necessarily have been created in substantially similar form even absent the anticipated litigation. It follows that we RECOMMEND that the District Court find that the work product doctrine does not extend to these documents:

14 (CM0000098–CM0000100), 14 (CM0000107–CM0000142), 127 (PM0000954–PM0000956), 127 (PM0000963–PM0000998), 128 (PM0001037–PM0001039), 128 (PM0001046–PM0001081), 145 (PM0001363–PM0001365), 145 (PM0001372–PM0001407), 148

---

**16.** Aside from the handwritten notes, this document appears to be the same as number 19, which Chevron concedes is not protected by the work product doctrine. Thus, we do not consider whether the document itself is pro-

tected under the work product doctrine and recommend only that the handwritten notes be redacted.

**17.** *See, supra,* note 16.

(PM0001450–PM0001452) and 148 (PM0001459–PM0001494).

## IV. *Waiver*

On February 20, 2002, the government filed a letter brief in which it contends that certain disclosures by Chevron effected one or more subject matter waivers. *See*, letter, dated and filed February 20, 2002, at 1–3.

Whether or not a particular disclosure effects a subject matter waiver is largely a question of fairness. The court must determine, among other things, whether limiting disclosure to the communications actually disclosed would unfairly disadvantage the discovering party or would create an unfair benefit to the privilege holder. The government's February 20 letter brief does not address these fairness considerations.

The issue of waiver has not been adequately briefed by either party and is not currently on the table. We RECOMMEND that briefing and decision of this issue await the District Court's consideration of this Report and Recommendation. If, after considering all the pertinent matters of record and disclosures, the government believes that fairness compels some subject matter waiver, the government may then move the court with respect to that issue.

Similarly, if the government wishes to move the court for disclosure of any documents that the District Court determines fall within the reach of the work product doctrine (*e.g.*, by demonstrating a substantial need and inability to obtain the information through other sources), the government should brief that issue along with its waiver arguments, if any.

**IT IS SO REPORTED AND RECOMMENDED.**

March 25, 2002.

## REPORT AND RECOMMENDATION RE SUPPLEMENTAL SUBMISSIONS

BRAZIL, United States Magistrate Judge.

## I. *INTRODUCTION*

On March 25, 2002, this court submitted its Report and Recommendation re *In Camera* Review to the District Court. The parties sought review of some of this court's recommendations. Chevron also moved the District Court to supplement the record. On May 23, 2002, the District Court granted Chevron's requests to supplement the record and referred consideration of the additional evidence to this court.

Chevron's supplemental evidence consists of (1) the Declaration of John Chigbu, signed April 2, 2002, ("Chigbu Decl."), (2) the First Supplemental Declaration of John Chigbu Submitted Under Seal, filed May 28, 2002 ("Supplemental Chigbu Decl.") and (3) the Declaration of Warren J. Brechtel in Support of Respondent's Response to Petitioner's Objections, signed April 18, 2002 ("Brechtel Decl.").

Initially, the parties provided the court with copies of briefs filed with the District Court. *See*, Letter to Court from Mr. Kelleher, filed May 29, 2002. Because the parties' arguments with respect to the Brechtel Declaration were interwoven with arguments not currently before this court, the court asked the parties to meet and confer to establish a briefing schedule for filing briefs that focused only on the issues pertaining to the Brechtel Declaration. On June 6, 2002, the IRS filed its Memorandum Re: Whether the Subject Documents Are Not Protected by the Attorney Work Product Doctrine Because They Would Have Been Created in Essentially Similar Form Irrespective of Possible Liti-

gation ("Memorandum"). On June 13, 2002, Chevron filed its Response to Government Memorandum Re: Whether the Subject Documents Are Not Protected by the Attorney Work Product Doctrine Because They Would Have Been Created in Essentially Similar Form Irrespective of Possible Litigation ("Response").

The court has considered Chevron's supplemental evidence and the parties' focused briefs and RECOMMENDS as follows.

## II. *JOHN CHIGBU'S NOTES & ATTORNEY CLIENT PRIVILEGE*

Chevron asks the court to reconsider its earlier recommendation that Mr. Chigbu's notes are not entitled to attorney-client protection [1] because Mr. Chigbu's handwriting is mostly illegible and because no evidence in the record would enable the court to determine whether the notes reflect "communications," whether those communications were made at meetings and, if so, who attended those meetings and what the purpose of those meetings was. Report and Recommendation at 18–19.

The Chigbu Declaration describes which notes reflect meetings, who was in attendance at each meeting and why each meeting was held. The Supplemental Chigbu Declaration transcribes the text of Mr. Chigbu's notes.

Having considered the Chigbu Declaration and the Supplemental Chigbu Declaration, the court RECOMMENDS that the District Court find as follows.

1. This court recommended, however, that the District Court find that the work product doctrine extends to Mr. Chigbu's notes.

2. The attorney client privilege protects *communications*.

3. With respect to document 19, Mr. Chigbu states that the meeting that is the subject of

The attorney client privilege does not protect the notes found on document 13 because these notes do not contain or reflect a *communication* between attorney and client.[2]

The attorney client privilege does not protect the notes found on documents 19, 21, 25, 34, 35, and 39. The notes on these documents reflect or contain communications made at meetings attended by employees of Price Waterhouse. Chevron has not maintained the confidentiality of communications disclosed to Price Waterhouse.[3] Report and Recommendation at 4–9.

The following documents reflect confidential attorney client communications made for the purpose of obtaining or providing legal advice and are protected by the attorney client privilege: 16, 22, 23, 24, 27 36, 37 and 38.

## III. *WORK PRODUCT PROTECTION*

### A. *Background*

The IRS contends that, in applying *U.S. v. Adlman*, 134 F.3d 1194 (2nd Cir.1998), this court considered only whether the subject documents would have been created "but for" anticipation of litigation and failed to consider whether essentially similar documents would have been created in the normal course of business. More specifically, the IRS contends that some of the documents to which this court extended the work product doctrine would have been created in similar form in connection

those notes was attended by "either" Warren Brechtel of Chevron or Warren Glettner of Price Waterhouse. Because Mr. Glettner is a third party, Chevron has not met its burden to demonstrate that it has maintained the confidentiality of communications made at this meeting.

with Chevron's tax returns, financial reporting obligations, and/or tax accrual assessment. Memorandum at 1.

In support of its argument the IRS points to Chevron's "privilege log." The log indicates that members of Chevron's Tax Compliance Group (the personnel responsible for filing Chevron's tax returns) and Price Waterhouse "auditors" were involved in the challenged transaction. According to the IRS, the involvement of these personnel together with Chevron's summaries of some documents' raise a suspicion that Price Waterhouse auditors assisted Chevron's Compliance personnel in filing Chevron's tax returns and/or determining how to treat the transaction for purposes of Chevron's financial reporting obligations. If this is true, the IRS continues, then some of the withheld documents might have been created in essentially similar form in the normal course of preparing Chevron's tax returns or complying with SEC financial reporting requirements.

The Brechtel Declaration responds to these contentions. Mr. Brechtel, Manager of Chevron's Compliance Group, testified that Price Waterhouse did not assist or advise Compliance personnel with respect to reporting the challenged transaction on Chevron's tax returns. Brechtel Decl., at ¶ 7.

### B. *Discussion*

At the outset, we note that in reaching its March 25th recommendations this court did consider not only whether each document would have been created "but for" the anticipated litigation but also whether an essentially similar document would have been created in the normal course of business. *See,* Report and Recommendation at 28:5–7. Nonetheless, we have considered

carefully the argument now asserted by the IRS.

The IRS relies on *U.S. v. Arthur Young & Co.,* 465 U.S. 805, 104 S.Ct. 1495, 79 L.Ed.2d 826 (1984). *Arthur Young* defines "tax accrual workpapers" and holds that an independent auditor's tax accrual workpapers are relevant to the IRS' investigation of the taxpayer's returns. The Court also holds that no work product immunity, analogous to the "attorney work product doctrine,"[4] protects an independent auditor's tax accrual workpapers. *Arthur Young,* 465 U.S. at 817, 104 S.Ct. 1495.

*Arthur Young* is, however, distinguishable from the case at bar in at least one important respect.

In *Arthur Young* the accountant whose workpapers the IRS sought was an *independent* auditor hired by Amerada Hess Corporation to review its financial statements as required by the securities laws. Encompassed in this review the auditor evaluated Amerada's *completed* transactions. In declining to find that an "accountant work product doctrine" protects the tax accrual workpapers at issue the Court explains that Arthur Young was acting as an *independent* auditor to verify financial statements used by the public to make investment decisions. Arthur Young was imbued with "public responsibility transcending any employment relationship with the client"—the *independent* auditor was a "public watchdog." 465 U.S. at 817–818, 104 S.Ct. 1495.

In contrast, Price Waterhouse was not acting remotely as an *independent* auditor with respect to the challenged transaction. Price Waterhouse proposed the transaction, stood to gain substantial consulting revenue from Chevron's decision to evaluate and move forward with the transaction,

---

4. We note that the "attorney work product doctrine" protects not only work product by the attorney but also that by the client or the client's or attorney's agents.

and conducted substantial legal analysis that was designed to support the transaction in litigation against the IRS. Moreover, Price Waterhouse did not simply evaluate the transaction after it was complete but was intimately involved in structuring the transaction throughout. Price Waterhouse's workpapers [5] are not neutral evaluations made for the purpose of reassuring the investing public as were the workpapers at issue in *Arthur Young*. This fact necessarily affects our assessment of whether public policy supports a finding that the subject documents are encompassed by a source of protection.

While *Arthur Young* declined to create an accountant's work product immunity the Court acknowledged that the IRS' subpoena power is "subject to the traditional privileges and limitations." 465 U.S. at 816, 104 S.Ct. 1495. Therefore, *Arthur*

*Young* does not foreclose application of the *attorney* work product doctrine to accountant "workpapers" in an appropriate situation.

In our view, this is such a situation. *See,* Report and Recommendation at 25:18–21.

Despite the salient difference between *Arthur Young* and the case at bar we have re-reviewed carefully the subject documents to consider whether any of them might have been created in essentially similar form in the normal course of business. We have looked assertively for evidence that the withheld documents or documents that would be similar in content would have been generated in the course of preparing Chevron's tax returns, meeting its financial reporting obligations or addressing tax accrual matters.[6] Except to the

---

**5.** As defined by *Arthur Young* "tax accrual workpapers" would relate to Chevron's *"reserves* for contingent tax liabilities." *Arthur Young,* 465 U.S. at 808, 104 S.Ct. 1495 emphasis added. There are a few instances where the papers in issue here reflect awareness that an adverse ruling by the IRS was possible and that such a ruling could cause substantial tax consequences. That fact does not, however, come close to bringing the withheld documents and communications within the ambit of *Arthur Young.* As previously stated, at issue in *Arthur Young* were documents "prepared by an independent auditor in the course of a routine review of corporate financial statements." 465 U.S. at 815, 104 S.Ct. 1495. The Court's decision that the documents therein could not be withheld pursuant to any privilege or immunity was driven not by the topic of the documents, but by who prepared them and why. Accordingly, in our case, it is not that the subject of potential tax liability was touched upon in a few of the withheld documents but the fact that those documents were prepared by Chevron or its agent in order to prepare for litigation that drives our recommendation that those few documents are eligible for work product protection.

**6.** We have not been asked to revisit the issue of whether any of the withheld documents are

ineligible for protection by the work product doctrine because, given the character of the challenged transaction, Chevron would have been required to generate essentially similar documents in the normal course of the business of *completing the transaction* irrespective of the anticipated litigation. Nonetheless, to try to be as helpful as possible to the District Court we make the following observation.

There are several unusual features of the setting we address here that create a risk that we would miss the work product policy mark if we were to order the disputed documents disclosed simply because Chevron might have needed to generate documents similar in character in order to undertake a transaction of this kind.

This transaction arises in an unusual environment. First, at least one of the reasons Chevron considered this transaction was to achieve sizeable tax benefits. Second, from the first day Chevron contemplated a transaction of this type it was a virtual certainty that the IRS would challenge the transaction in litigation. It was equally clear that that litigation would relate solely to treatment of the transaction under the tax code. Under these circumstances virtually every decision about how to structure a material aspect of the transaction was permeated with questions

extent noted in footnote 5 above, we have found none.

In their Memorandum the IRS identified descriptions of documents which it contends would support an inference that the services Price Waterhouse performed may fall within the ambit of the kinds of services for which, pursuant to *Arthur Young*, the law provides no immunity. *See*, Memorandum at 2–3 (table).

This court reviewed each of those documents. None of the documents cited by the IRS support an inference that Price Waterhouse acted as an "auditor" in connection with Chevron's tax returns, financial reporting obligations, or tax accrual assessments.[7]

In an abundance of caution, we also re-reviewed those documents that we previously recommended the District Court find are eligible for protection under the work product doctrine. Those documents fell into two categories: (1) documents reflecting legal analysis and (2) business/litigation documents that appear to reflect or be borne out of reasoning about strategies or analyses connected with the anticipated litigation. *See*, Report and Recommendation at 25–28.

With respect to the "business/litigation" documents eligible for protection, the court re-reviewed each document (or portion of the document) to satisfy itself that Chevron and/or Price Waterhouse would not have created that document in essentially similar form in connection with Chevron's tax returns, financial reporting obligations or tax accrual matters.

The remaining documents consist of legal analyses of the anticipated litigation. These documents necessarily contain analyses of how specific aspects of the challenged transaction may be treated under the tax code. It is true that an *independent* auditor reviewing the *completed* transaction most likely also would conduct analyses of how certain aspects of the transaction could be treated under the tax

---

about how that structuring would affect treatment under the tax code. As this court noted in its earlier recommendations determining treatment under the tax code is an intensely legal endeavor. Report and Recommendation at 14.

Where, as here, the essential character of the transaction is riddled with tax legal issues, we find it difficult to draw a line between documents that were prepared to analyze legal issues in anticipation of litigation and those that the character of the transaction would have required Chevron and its agents to prepare in order to structure the transaction irrespective of the litigation. More importantly, for purposes of analysis of work product issues, we conclude that anticipation of litigation with the IRS, more than any other factor, dominated the mind set and informed the actions of the authors of the subject documents.

7. Documents 4, 98, 156, 160 & 166 are the same document. The substance of the document has nothing to do with tax returns, financial reporting, or tax accrual matters.

We see no basis for inferring that this document would have been created in similar form in the normal course of business.

Documents 45, 45B, 45C, 105, 106 & 107 reflect discussions about *how* to structure the transaction. We also see no basis for inferring that these documents would have been created in similar form in connection with preparation of tax returns, submitting financial reports or assessing reserves for accrual of taxes.

Documents 30 & 30A discuss tax treatment of certain aspects of the completed transaction and were drafted around the time the Compliance Group would have been preparing Chevron's 1999 tax returns. However, these documents are protected by the attorney client privilege. Price Waterhouse was not involved in the creation of these documents, and it does not appear Chevron shared them with Price Waterhouse. Furthermore, nothing in these documents supports an inference that *other* documents Chevron has withheld would have been created in similar form in the normal course of business.

code. That fact does not support a finding that Price Waterhouse's legal analyses are "really" accountant workpapers not subject to protection.

As stated earlier, *Arthur Young* does not foreclose application of the "traditional" attorney work product doctrine in an appropriate situation. Federal Rules of Civil Procedure, Rule 26(b)(3) directs the courts to "protect against disclosure of the mental impressions, conclusions, opinions, or legal theories [so-called "opinion" work product] of an attorney *or other representative* [of Chevron] concerning the litigation." Emphasis added.

We are satisfied that, in the case before us, Price Waterhouse acted as an agent of Chevron, acting in anticipation of litigation, when preparing its extensive legal analyses of the challenged transaction. The fact that *Arthur Young* Court denied protection to very different kinds of papers created for a different purpose in a different setting is irrelevant.

## IV. *CONCLUSION*

This court AMENDS its Report and Recommendation, filed March 25, 2002, with respect to whether the attorney client privilege protects the handwritten notes by Mr. Chigbu as described in section II above.

This court DECLINES to amend its Report and Recommendation, filed March 25, 2002, with respect to documents eligible for protection under the ("attorney") work product doctrine.

**IT IS SO REPORTED AND RECOMMENDED.**

June 18, 2002.