**UNITED STATES of America,**
**Appellee,**

v.

**Louis KOVEL, Defendant-Appellant.**

**No. 168, Docket 27207.**

United States Court of Appeals
Second Circuit.

Argued Nov. 2, 1961.

Decided Dec. 5, 1961.

Louis Bender, New York City (Louis Bender and Jerome Kamerman), New York City, for appellant.

Gerald Walpin, Asst. U. S. Atty., New York City (Robert M. Morgenthau, U. S. Atty. for Southern Dist. of New York, David Klingsberg, Asst. U. S. Atty., New York City, of counsel), for appellee.

New York County Lawyers' Association, New York City (Boris Kostelanetz, Jules Ritholz and Bud G. Holman, New York City, of counsel), submitted a brief as amicus curiae.

Before CLARK, HINCKS and FRIENDLY, Circuit Judges.

FRIENDLY, Circuit Judge.

This appeal from a sentence for criminal contempt for refusing to answer a question asked in the course of an inquiry by a grand jury raises an important issue as to the application of the attorney-client privilege to a non-lawyer employed by a law firm. Our decision of that issue leaves us with the further problem of what disposition is appropriate on a record which, due to the extreme positions erroneously taken by both parties in the court below, lacks the evidence needed to determine whether or not the privilege existed. We vacate the judgment and remand so that the facts may be developed.

Kovel is a former Internal Revenue agent having accounting skills. Since 1943 he has been employed by Kamerman & Kamerman, a law firm specializing in tax law. A grand jury in the Southern District of New York was investigating alleged Federal income tax violations by Hopps, a client of the law firm; Kovel was subpoenaed to appear on September 6, 1961, a few days before the date, September 8, when the Government feared the statute of limitations might run. The law firm advised the Assistant United States Attorney that since Kovel was an employee under the direct supervision of the partners, Kovel could not disclose any communications by the client or the result of any work done for the client, unless the latter consented; the Assistant answered that the attorney-client privilege did not apply to one who was not an attorney.

The record reveals nothing as to what occurred on September 6. On September 7, the grand jury appeared before Judge Cashin. The Assistant United States Attorney informed the judge that Kovel had refused to answer "several questions * * * on the grounds of attorney-client privilege"; he proffered "respectable authority * * * that an accountant, even if he is retained or employed by a firm of attorneys, cannot take the privilege." The judge answered "You don't have to give me any authority on that." A court reporter testified that Kovel, after an initial claim of privilege had admitted receiving a statement of Hopps' assets and liabilities, but that, when asked "what was the purpose of your receiving that," had declined to answer on the ground of privilege "Because the communication was received with a purpose, as stated by the client"; later questions and answers indicated the communication was a letter addressed to

920

Kovel. After verifying that Kovel was not a lawyer, the judge directed him to answer, saying "You have no privilege as such." The reporter then read another question Kovel had refused to answer, "Did you ever discuss with Mr. Hopps or give Mr. Hopps any information with regard to treatment for capital gains purposes of the Atlantic Beverage Corporation sale by him?" The judge again directed Kovel to answer, reaffirming "There is no privilege—you are entitled to no privilege, as I understand the law." Kovel asked whether he might say something; the judge instructed him to answer, saying "I'm not going to listen." Kovel also declined to tell what Hopps had said concerning a transaction underlying a bad debt deduction in Hopps' 1954 return, and whether Hopps had told him that a certain transfer of securities "had no effect whatsoever" and was just a form of accommodation; the judge gave similar directions after the reporter had read each question and refusal to answer. Then the grand jury, the Assistant and Kovel returned to the grand jury room.

Later on September 7, they and Kovel's employer, Jerome Kamerman, now acting as his counsel, appeared again before Judge Cashin. The Assistant told the judge that Kovel had "refused to answer some of the questions which you had directed him to answer." A reporter re-read so much of the transcript heretofore summarized as contained the first two refusals. The judge offered Kovel another opportunity to answer, reiterating the view, "There is no privilege to this man at all." Counsel referred to New York Civil Practice Act, § 353, which we quote in the margin,[1] and sought an adjournment until co-counsel could appear; the judge put the matter over until the next morning.

On the morning of September 8, the same dramatis personae, plus the added

counsel, attended in open court. Counsel reiterated that an employee "who sits with the client of the law firm * * * occupies the same status * * * as a clerk or stenographer or any other lawyer * * *"; The judge was equally clear that the privilege was never "extended beyond the attorney." In the course of a colloquy the Assistant made it plain that further questions beyond the two immediately at issue might be asked. After the judge had briefly retired, leaving the Assistant and Kovel with the grand jury, proceedings in open court resumed. The reporter recited that in the interval, on reappearing before the grand jury and being asked "What was the purpose communicated to you by Mr. Hopps for your receiving from him an asset and liability statement of his personal financial situation?", Kovel had declined to answer. On again being directed to do so, Kovel declined "on the ground that it is a privileged communication." The court held him in contempt, sentenced him to a year's imprisonment, ordered immediate commitment and denied bail. Later in the day, the grand jury having indicted, Kovel was released until September 12, at which time, without opposition from the Government, I granted bail pending determination of this appeal.

Here the parties continue to take generally the same positions as below— Kovel, that his status as an employee of a law firm automatically made all communications to him from clients privileged; the Government, that under no circumstances could there be privilege with respect to communications to an accountant. The New York County Lawyers' Association as *amicus curiae* has filed a brief generally supporting appellant's position.

I.

■ Decision under what circumstances, if any, the attorney-client privi-

1. "An attorney or counselor at law shall not disclose, or be allowed to disclose, a communication, made by his client to him, or his advice given thereon, in the course of his professional employment, nor shall any clerk, stenographer or other person employed by such attorney or counselor * * * disclose, or be allowed to disclose, any such communication or advice."

lege may include a communication to a nonlawyer by the lawyer's client is the resultant of two conflicting forces. One is the general teaching that "The investigation of truth and the enforcement of testimonial duty demand the restriction, not the expansion, of these privileges," 8 Wigmore, Evidence (McNaughton Rev. 1961), § 2192, p. 73. The other is the more particular lesson "That as, by reason of the complexity and difficulty of our law, litigation can only be properly conducted by professional men, it is absolutely necessary that a man * * * should have recourse to the assistance of professional lawyers, and * * * it is equally necessary * * * that he should be able to place unrestricted and unbounded confidence in the professional agent, and that the communications he so makes to him should be kept secret * * *," Jessel, M. R. in Anderson v. Bank, 2 Ch.D. 644, 649 (1876). Nothing in the policy of the privilege suggests that attorneys, simply by placing accountants, scientists or investigators on their payrolls and maintaining them in their offices, should be able to invest all communications by clients to such persons with a privilege the law has not seen fit to extend when the latter are operating under their own steam. On the other hand, in contrast to the Tudor times when the privilege was first recognized, see 8 Wigmore, Evidence, § 2290, the complexities of modern existence prevent attorneys from effectively handling clients' affairs without the help of others; few lawyers could now practice without the assistance of secretaries, file clerks, telephone operators, messengers, clerks not yet admitted to the bar, and aides of other sorts. "The assistance of these agents being indispensable to his work and the communications of the client being often necessarily committed to them by the attorney or by the client himself, the privilege must include all the persons who act as the attorney's agents." 8 Wigmore, Evidence, § 2301; Annot., 53 A.L.R. 369 (1928).[2]

Indeed, the Government does not here dispute that the privilege covers communications to non-lawyer employees with "a menial or ministerial responsibility that involves relating communications *to an attorney*." We cannot regard the privilege as confined to "menial or ministerial" employees. Thus, we can see no significant difference between a case where the attorney sends a client speaking a foreign language to an interpreter to make a literal translation of the client's story; a second where the attorney, himself having some little knowledge of the foreign tongue, has a more knowledgeable non-lawyer employee in the room to help out; a third where someone to perform that same function has been brought along by the client; and a fourth where the attorney, ignorant of the foreign language, sends the client to a non-lawyer proficient in it, with instructions to interview the client on the attorney's behalf and then render his own summary of the situation, perhaps drawing on his own knowledge in the process, so that the attorney can give the client proper legal advice. All four cases meet every element of Wigmore's famous formulation, § 2292, "(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived," save (7); literally, none of them is within (7) since the disclosure

---

2. N.Y.Civil Practice Act, § 353, is a legislative recognition of this principle. We doubt the applicability of the New York statute in a Federal grand jury proceeding; plainly, under F.R.Crim.Proc. 26, 18 U.S.C., it would not be applicable in a Federal criminal trial and we cannot believe the framers of the Criminal Rules intended state law to apply in the former case when it would not in the latter. However, decision of the issue is unnecessary, for there is nothing to indicate the New York legislature intended to do more than enact the principles of the common law.

is not sought to be compelled from the client or the lawyer. Yet § 2301 of Wigmore would clearly recognize the privilege in the first case and the Government goes along to that extent; § 2301 would also recognize the privilege in the second case and § 2311 in the third unless the circumstances negated confidentiality. We find no valid policy reason for a different result in the fourth case, and we do not read Wigmore as thinking there is. Laymen consulting lawyers should not be expected to anticipate niceties perceptible only to judges—and not even to all of them.

This analogy of the client speaking a foreign language is by no means irrelevant to the appeal at hand. Accounting concepts are a foreign language to some lawyers in almost all cases, and to almost all lawyers in some cases. Hence the presence of an accountant, whether hired by the lawyer or by the client, while the client is relating a complicated tax story to the lawyer, ought not destroy the privilege, any more than would that of the linguist in the second or third variations of the foreign language theme discussed above; the presence of the accountant is necessary, or at least highly useful, for the effective consultation between the client and the lawyer which the privilege is designed to permit.[3] By the same token, if the lawyer has directed the client, either in the specific case or generally, to tell his story in the first instance to an accountant engaged by the lawyer, who is then to interpret it so that the lawyer may better give legal advice, communications by the client reasonably related to that purpose ought fall within the privilege; there can be no more virtue in requiring the lawyer to sit by while the client pursues these possibly tedious preliminary conversations with the accountant than in insisting on the lawyer's physical presence while the client dictates a statement to the lawyer's secretary or is interviewed by a clerk not yet admitted to practice. What is vital to the privilege is that the communication be made *in confidence* for the purpose of obtaining *legal* advice *from the lawyer*. If what is sought is not legal advice but only accounting service, as in Olender v. United States, 210 F.2d 795, 805–806 (9 Cir. 1954), see Reisman v. Caplin, 61–2 U.S. T.C. ¶ 9673 (1961), or if the advice sought is the accountant's rather than the lawyer's, no privilege exists. We recognize this draws what may seem to some a rather arbitrary line between a case where the client communicates first to his own accountant (no privilege as to such communications, even though he later consults his lawyer on the same matter, Gariepy v. United States, 189 F.2d 459, 463 (6 Cir. 1951)),[4] and others, where the client in the first instance consults a lawyer who retains an accountant as a listening post, or consults the lawyer with his own accountant present. But that is the inevitable consequence of having to reconcile the absence of a privilege for accountants and the effective operation of the privilege of client and lawyer under conditions where the lawyer needs outside help. We realize also that the line we have drawn will not be so easy to apply as the simpler positions urged on us by the parties—the district judges

3. To such extent as the language in Himmelfarb v. United States, 175 F.2d 924, 939 (9 Cir. 1949), may be *contra*, we must respectfully disagree. The *amicus curiae* brief suggests the actual decision in Himmelfarb may be supported because the record there shows the information had been given by the client for the precise purpose of transmission to a special agent of the Internal Revenue Service and had in fact been so transmitted pursuant to the client's authorization; if that be so, the necessary element of confidentiality was lacking.

4. We do not deal in this opinion with the question under what circumstances, if any, such communications could be deemed privileged on the basis that they were being made to the accountant as the client's agent for the purpose of subsequent communication by the accountant to the lawyer; communications by the client's agent to the attorney are privileged, 8 Wigmore, Evidence, § 2317–1. See Lalance & Grosjean Mfg. Co. v. Haberman Mfg. Co., 87 F. 563 (C.C.S.D.N.Y., 1898).

will scarcely be able to leave the decision of such cases to computers; but the distinction has to be made if the privilege is neither to be unduly expanded nor to become a trap.[5]

## II.

The application of these principles here is more difficult than it ought be in future cases, because the extreme positions taken both by appellant and by the Government, the latter's being shared by the judge, resulted in a record that does not tell us how Hopps came to be communicating with Kovel rather than with Kamerman. The Government says the burden of establishing the privilege was on Kovel and, since he did not prove all the facts essential to it even on our view, the sentence must stand. Kovel rejoins that the Government always has the burden of showing a criminal defendant's guilt and, since the proof does not negate the possible existence of a privilege, the sentence must fall.

▆▆▆ We follow the Government's argument at least to this extent: If we were here dealing with a trial at which a claim of privilege like Kovel's had been overruled and the witness had answered, we should not reverse, since "the burden is on the objector to show that the relation" giving rise to the privilege existed. Woodrum v. Price, 104 W.Va. 382, 389, 140 S.E. 346, 349 (1927). On the other hand, appellant is right that, in a prosecution for criminal contempt, the ultimate burden of persuasion on the issue of privilege remains the Government's, see Michaelson v. United States, 266 U.S. 42, 66, 45 S.Ct. 18, 69 L.Ed. 162 (1924); United States v. Fleischman, 339 U.S. 349, 70 S.Ct. 739, 94 L.Ed. 906 (1950); United States v. Patterson, 219 F.2d 659 (2 Cir. 1955); e. g., if Kamerman had testified he had told Hopps preliminarily to discuss with Kovel the transactions Kovel declined to disclose, and the Government challenged this testimony, it would have had the burden of convinc-

ing the judge on the facts. The burden that the Government's proof did shift to Kovel was that of going forward with evidence supporting the claim of privilege, United States v. Fleischman, supra. Kovel did not discharge that burden, on our view of the law; he claims he was relieved of any need of doing so since the course of the proceedings had made it apparent that no evidence he could have submitted would have influenced the district judge and the law does not require the ritual performance of a useless act, citing United States v. Zwillman, 108 F.2d 802 (2 Cir. 1940). However, the needs of the appellate court also must be considered; in order to preserve Kovel's position on appeal counsel should have proffered the necessary evidence and, if the judge would not receive it, should have made an offer of proof, along the lines prescribed in civil cases by F.R.Civ.Proc. 43(c), 28 U.S.C. Without this we are left in the dark whether a remand will serve any purpose; although the Zwillman opinion dispensed with a formal offer, 108 F.2d p. 804, the record there afforded more assurance that the evidence the judge had refused to consider might sustain the privilege than we have here with respect to evidence not mentioned before the judge, whether or not it exists in other grand jury minutes. However, the uncertainty as to the applicable legal principle, the fixed view of the judge, and the haste with which the proceedings were here conducted because of the prospective running of the statute of limitations, extenuate although they do not altogether excuse the failure of Kovel's counsel to make a proper offer of proof; and a remand for determination of a few simple facts by the judge will not be burdensome. With petitioner's liberty at stake, we believe that the proper course, 28 U.S.C. § 2106.

▆▆▆ A final point requires consideration, namely, the Government's contention that the question appellant declined to answer was designed to provide the

5. City & County of San Francisco v. Superior Court, etc., 37 Cal.2d 227, 231 P.2d 26, 25 A.L.R.2d 1418 (1951), and

State v. Kociolek, 23 N.J. 400, 129 A.2d 417 (1957), accord generally with the above analysis.

very factual basis which, on our view, was needed to determine whether the privilege existed. On one reading it was exactly that. If the judge had so explained the question, Kovel would have been bound to answer it to him; a witness claiming the attorney-client privilege may not refuse to disclose to the judge the circumstances into which the judge must inquire in order to rule on the claim, People's Bank of Buffalo v. Brown, 112 F. 652 (3 Cir. 1902); Steiner v. United States, 134 F.2d 931, 935 (5 Cir. 1943); Schwimmer v. United States, 232 F.2d 855, 864 (8 Cir.), cert. denied, 352 U.S. 833, 77 S.Ct. 48, 1 L.Ed. 2d 52 (1956). However, the question was susceptible of other meanings; Kovel could well have understood it as calling for an answer relating to the substance of what Hopps had told him, a substance that might have included admissions whose disclosure would be seriously damaging. On the previous day the direction to answer this question had been linked with two others relating to

substance and, just prior to the critical refusal, the Assistant had made it plain that still other questions might come. Although not entirely clear, it seems that the "purpose" of Hopps in sending the figures may have been stated in a letter. If so, Kovel would doubtless have been thinking of whatever the letter said and we do not know what that was; yet the idea of allowing the judge preliminarily to examine the letter was not advanced by anyone. Moreover, the proper practice is for the judge to conduct his preliminary inquiry into the existence of the privilege with the jury excused, see Steiner v. United States, supra, 134 F. 2d at 934–935; here the question was asked with the jury present. Kovel's understanding of the question also may be explored on the remand—although, in view of what we have been compelled to say on the subject, perhaps without too much practical effect.

The judgment is vacated and the cause remanded for further proceedings consistent with this opinion.