CALVIN KLEIN TRADEMARK TRUST
and Calvin Klein, Inc., Plaintiffs,

v.

Linda WACHNER, the Warnaco Group, Inc., Warnaco Inc., Designer Holdings Ltd., CKJ Holdings, Inc., Jeanswear Holdings, Inc., Calvin Klein Jeanswear Company and Outlet Holdings, Inc., Defendants.

No. 00 Civ. 4052(JSR).

United States District Court,
S.D. New York.

Dec. 5, 2000.

Jonathan D. Schiller, Boies, Schiller & Flexner, LLP, Washington, DC, David R. Boyd, David Boies, Armonk, NY, Andrew Hayes, for plaintiffs.

Kevin T. Baine, Washington, DC, Brendan Sullivan, Greg Craig, Washington, DC, for defendants.

## MEMORANDUM ORDER

RAKOFF, District Judge.

Defendants challenge the assertion by plaintiffs of attorney-client privilege and work-product protection with respect to certain otherwise responsive documents and testimony sought by defendants from the public relations firm of Robinson Lerer & Montgomery ("RLM") and from an RLM employee, Donald Nathan. The Court, having considered the parties' letter-briefs (including an unauthorized second brief from plaintiffs, which the Court has nevertheless considered) and having reviewed *in camera* the documents withheld from defendants, denies plaintiffs' assertion of attorney-client privilege and sustains in part and denies in part plaintiffs' assertion of work product protection, for the reasons that follow.

In May, 2000, in anticipation of filing the instant lawsuit, plaintiffs' counsel, the law firm of Boies, Schiller & Flexner LLP ("BSF"), retained RLM to act "as a consultant to [BSF] for certain communications services in connection with [BSF's] representation of Calvin Klein, Inc." *See* Letter dated May 19, 2000 from Patrick S. Gallagher, Chief Financial Officer of RLM, to Jonathan D. Schiller, Esq. of BSF. At the time, RLM was already working directly for plaintiff Calvin Klein, Inc. ("CKI") pursuant to an agreement dated September 10, 1999. *Id.*

While defendants contend that BSF retained RLM "to wage a press war against the defendant," *see* Defendants' Letter Brief dated November 30, 2000, at 1, plaintiffs contend that RLM's retention served more defensive purposes, *i.e.*, to help BSF "to understand the possible reaction of CKI's constituencies to the matters that would arise in the litigation, to provide legal advice to CKI, and to assure that the media crisis that would ensue—including responses to requests by the media about the law suit and the overall dispute between the companies—would be handled responsibly...." *See* Plaintiffs' Letter Brief dated November 29,

2000, at 3. None of these vague and largely rhetorical contentions by the respective parties is particularly helpful to assessing the purpose of the documents here in issue, many of which appear on their face to be routine suggestions from a public relations firm as to how to put the "spin" most favorable to CKI on successive developments in the ongoing litigation. In any event, however, no matter how these documents are viewed, none qualifies for the protection of the attorney client privilege, for at least three reasons.

■ *First*, and foremost, few, if any, of the documents in issue appear to contain or reveal confidential communications from the underlying client, CKI, made for the purpose of obtaining legal advice. Yet it is only such communications that the attorney-client privilege ultimately protects. *See, e.g., United States v. Kovel*, 296 F.2d 918, 921 (2d Cir. 1961) (citing Wigmore). Thus, the possibility that communications between RLM and BSF may help the latter to formulate legal advice is not in itself sufficient to implicate the privilege: "the privilege protects communications between a client and an attorney, not communications that prove important to an attorney's legal advice to a client." *United States v. Ackert*, 169 F.3d 136, 139 (2d Cir. 1999).

■ *Second*, even assuming *arguendo* that somewhere hidden in the voluminous documents here in issue are nuggets of client confidential communications that were originally made for the purpose of seeking legal advice, their disclosure to RLM waives the privilege, since inspection of the documents here in question clearly establishes that RLM, far from serving the kind of "translator" function served by the accountant in *Kovel, supra*, is, at most, simply providing ordinary public relations advice so far as the documents here in question are concerned. Indeed, even RLM's own "Account Activity Report" to BSF for the period from May 27, 2000 to October 31, 2000 (item 38 on the privilege log, but only slightly redacted) shows that much of RLM's services for BSF consisted of such activities as reviewing press coverage, making calls to various media to comment on developments in the litigation,

and even "finding friendly reporters." The possibility that such activity may also have been helpful to BSF in formulating legal strategy is neither here nor there if RLM's work and advice simply serves to assist counsel in assessing the probable public reaction to various strategic alternatives, as opposed to enabling counsel to understand aspects of the client's own communications that could not otherwise be appreciated in the rendering of legal advice. *See Ackert,* 169 F.3d at 139; *Kovel,* 296 F.2d at 922.

*Third,* it must not be forgotten that the attorney-client privilege, like all evidentiary privileges, stands in derogation of the search for truth so essential to the effective operation of any system of justice: therefore, the privilege must be narrowly construed. *See, e.g., United States v. Nixon,* 418 U.S. 683, 710, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *In re Horowitz,* 482 F.2d 72, 81 (2d Cir.1973). Yet plaintiffs' approach would, instead, broaden the privilege well beyond prevailing parameters. On any fair view of the materials submitted for the Court's *in camera* inspection, RLM does not appear to have been performing functions materially different from those that any ordinary public relations firm would have performed if they had been hired directly by CKI (as they also were), instead of by CKI's counsel, BSF. "Nothing in the policy of the privilege suggests that attorneys, simply by placing accountants, scientists, or investigators [or, here, a public relations firm] on their payrolls ... should be able to invest all communications by clients to such persons with a privilege the law has not seen fit to extend when the latter are operating under their own steam." *Kovel,* 296 F.2d at 921. It may be that the modern client comes to court as prepared to massage the media as to persuade the judge; but nothing in the client's communications for the former purpose constitutes the obtaining of legal advice or justifies a privileged status.[1]

Turning to the assertion of "work product," it is obvious that as a general matter public relations advice, even if it bears on anticipated litigation, falls outside the ambit of protection of the so-called "work product" doctrine embodied in Rule 26(b)(3), Fed.R.Civ.P. That is because the purpose of the rule is to provide a zone of privacy for strategizing about the conduct of litigation itself, not for strategizing about the effects of the litigation on the client's customers, the media, or on the public generally. *See United States v. Nobles,* 422 U.S. 225, 238, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975); *United States v. Adlman,* 68 F.3d 1495, 1501 (2d Cir.1995).

It does not follow, however, that an otherwise valid assertion of work-product protection is waived with respect to an attorney's own work-product simply because the attorney provides the work-product to a public relations consultant whom he has hired and who maintains the attorney's work-product in confidence. *See, e.g., In re Pfizer Inc. Secs. Litig.,* 1993 WL 561125, *6 (S.D.N.Y. Dec. 23, 1993); *Niagara Mohawk Power Corp. v. Stone & Webster Eng'g Corp.,* 125 F.R.D. 578, 589 (N.D.N.Y.1989). This is especially so if, as plaintiffs here assert, the public relations firm needs to know the attorney's strategy in order to advise as to public relations, and the public relations impact bears, in turn, on the attorney's own strategizing as to whether or not to take a contemplated step in the litigation itself and, if so, in what form. In the instant case, four of the 38 categories of documents presented for the Court's *in camera* review fall into this category, to wit, categories 1, 2, 3, and 29, all of which consist of counsel-drafted or counsel-selected materials given by BSF or CKI's in-house counsel to RLM prior to the filing of the complaint in this case, following which RLM met with BSF to discuss the complaint. In addition, there appear to be several categories of documents (such as notes of witness interviews) that, even though prepared by RLM, appear to implicitly reflect BSF work-product. They are categories 7, 10, 11, 12, 19, and 27. Nor have defendants demon-

---

1. Although plaintiffs assert that the decision in *H.W. Carter & Sons, Inc. v. The William Carter Co.,* 1995 WL 301351 (S.D.N.Y. May 16, 1995) is contrary to the foregoing analysis, in fact it is impossible to tell from the very brief discussion of the issue in that case exactly what its *ratio decidendi* is.

strated a need for these materials that overcomes the work-product protection. Accordingly, the documents in categories 1, 2, 3, 7, 10, 11, 12, 19, 27, and 29 will be protected from disclosure, but none others.

From the foregoing analysis, it also follows that the directions given to RLM's employee, Donald Nathan, not to answer certain questions propounded at pages 21–22 and 39–40 of his deposition must be overruled. The similar direction given at page 10 of the deposition is, however, sustained.

In sum, plaintiffs are hereby ordered to furnish to defense counsel, by no later than December 7, 2000, unredacted copies of all documents on the RLM privilege log except those denominated as falling within categories 1, 2, 3, 7, 10, 11, 12, 19, 27, and 29 of that log; and RLM is hereby ordered to make Donald Nathan available, by no later than December 8, 2000, for a telephonic continuation of his deposition, not to exceed 20 minutes, for the purposes of answering the questions the witness was directed not to answer at pages 21–22 and 39–40 of his deposition, as well as any follow-up questions reasonably related thereto.

SO ORDERED.