In re GRAND JURY SUBPOENAS DATED MARCH 24, 2003 DIRECTED TO (A) GRAND JURY WITNESS FIRM AND (B) GRAND JURY WITNESS.

No. M11–189.

United States District Court,
S.D. New York.

June 2, 2003.

## MEMORANDUM OPINION

KAPLAN, District Judge.

This motion poses the troublesome question whether and to what extent the attorney-client privilege and the protection afforded to work product[1] extend to communications between and among a prospective defendant in a criminal case, her lawyers, and a public relations firm hired by the lawyers to aid in avoiding an indictment. The Court's original opinion in this matter was filed under seal in order to protect the secrecy of the grand jury. In view of the importance of this issues, this redacted version of the opinion,[2] which substitutes pseudonyms for names and omits other identifying information, is being filed in the public records of the Court.[3]

### I. Facts

#### A. The Procedural Context

The United States Attorney's office began a grand jury investigation of Target, a former employee of the Company, in or before March 2003. On March 24, 2003, it served a grand jury subpoena *ad testificandum* on Witness and another *duces tecum* on Witness's firm ("Firm"), a public relations concern. Counsel for Witness and Firm informed the United States At-

---

1. Except where otherwise indicated, "work product" refers to material prepared in anticipation of litigation or for trial, including material that reflects the mental impressions, conclusions, opinions or legal theories of an attorney.

2. The Court took into account the views of the parties with respect to the redactions that were required.

3. No inferences should be drawn from the gender of pronouns used to refer to Target and Witness in this redacted version of the opinion.

torney's office that Witness would decline to testify and that Firm declined to produce the subpoenaed documents on the ground that the information sought by the grand jury had been generated in the course of Firm's engagement by Target's lawyers, as a part of their defense of Target, and that it therefore was protected by the attorney-client privilege and constituted work product.

The government moved by order to show cause to compel compliance with the subpoenas, and Target intervened with the government's consent. The Court concluded that the government almost undoubtedly could ask Witness questions as to which there would be no proper objection, even assuming that Target's position were correct, and therefore required Witness to testify before the grand jury while allowing her to assert any objections in response to specific questions and thus to frame the issues more narrowly.

The Court initially required submission of the documents withheld by Firm on grounds of privilege for *in camera* inspection. On May 1, 2003, in an order that remains under seal, it held that certain portions of the documents constituted attorney opinion work product,[4] that the government had not made a showing sufficient to require production of those portions, assuming *arguendo* that such work product ever is discoverable, and directed Target and Firm to indicate whether the privilege objections would be pressed with respect to the remaining portions of those documents. They subsequently informed the Court that they continue to press those objections.

Witness testified before the grand jury. She answered some questions but asserted Target's alleged privilege[5] in response to others.

## B. The Hiring of Firm

This is a high profile matter. The investigation of Target has been a matter of intense press interest and extensive coverage for months. Witness claims that Target's attorneys hired Firm out of a concern that "unbalanced and often inaccurate press reports about Target created a clear risk that the prosecutors and regulators conducting the various investigations would feel public pressure to bring some kind of charge against" her.[6] Firm's "primary responsibility was defensive—to communicate with the media in a way that would help restore balance and accuracy to the press coverage. [The] objective ... was to reduce the risk that prosecutors and regulators would feel pressure from the constant anti-Target drumbeat in the media to bring charges ... [and thus] to neutralize the environment in a way that would enable prosecutors and regulators to make their decisions and exercise their discretion without undue influence from the negative press coverage."[7] Witness claims that "a significant aspect" of Firm's "assignment that distinguished it from standard public relations work was that [its] target audience was not the public at large. Rather, Firm was focused on affecting the media-conveyed message that reached the prosecutors and regulators re-

---

4. That is, it reflected the mental impressions, conclusions, opinions or legal theories of counsel.

5. Although the protection afforded to work product is not, technically speaking, an evidentiary privilege, the Court uses "privilege" to refer both to attorney-client privilege and to work product protection for ease of expression.

6. Witness Aff. ¶ 8.

7. *Id.* ¶ 9.

sponsible for charging decisions in the investigations concerning ... Target."[8]

## C. Firm's Activities

In carrying out her responsibilities, Witness had at least two conversations directly with and sent at least one e-mail directly to Target.[9] On other occasions, Firm interacted with Target's attorneys.[10] On still others, communications involved Firm, Target and the attorneys and, in a few cases, Target's spouse.[11] Some of the documents produced for *in camera* inspection included discussions about defense strategies, and there is no reason to doubt that this was true of many oral communications.[12] And while Target and Witness perhaps do not so admit in these precise terms, the conversations and e-mails exchanged among this group inevitably included discussion of at least some of the facts pertaining to the matters in controversy.

Firm's activities were not limited to advising Target and her lawyers. Firm spoke extensively to members of the media, in some instances to find out what they knew and, where possible, where the information came from.[13] And it conveyed to members of the media information that the Target defense team wished to have disseminated.[14]

**8.** *Id.* ¶ 12.

**9.** Grand Jury Tr., May 5, 2003, at 18–19, 29–30; Target Priv. 0011.

**10.** Grand Jury Tr. at 29.

**11.** *Id.* at 18–21, 29.

**12.** *See, e.g.,* Witness Aff. ¶ 13.

**13.** *See id.* ¶ 17.

**14.** Grand Jury Tr., May 5, 2003, at 21–22, 45–47.

## II. Discussion

### A. Attorney–Client Privilege

■ As this matter is entirely federal in nature, the scope of the attorney-client privilege is governed by FED.R.EVID. 501, which provides in relevant part that "the privilege of a witness ... shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." In consequence, the Court looks principally to decisions applying the federal common law of attorney-client privilege.

As the government argues, the broad outlines of the attorney-client privilege are clear:

"(1) where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal advisor, (8) except the protection be waived."[15]

But two qualifications must be made.

First, the privilege protects not only communications by the client to the lawyer. In many circumstances, it protects also communications by the lawyer to the client.[16]

**15.** *In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983,* 731 F.2d 1032, 1036 (2d Cir.1984) (internal citations omitted).

**16.** *E.g., United States v. Neal,* 27 F.3d 1035, 1048 (5th Cir.1994) (privilege " 'shields communications from the lawyer to the client only to the extent that these are based on, or may disclose, confidential information provided by the client or contain advice or opinions of the attorney.' ") (citing *Wells v. Rushing,* 755 F.2d 376, 379 n. 2 (5th Cir.1985)); *In re Six Grand Jury Witnesses,* 979 F.2d 939, 944 (2d Cir. 1992) (where the client is a corporation, the attorney-client privilege protects "both infor-

Second, the privilege in appropriate circumstances extends to otherwise privileged communications that involve persons assisting the lawyer in the rendition of legal services.[17] This principle has been applied universally to cover office personnel, such as secretaries and law clerks, who assist lawyers in performing their tasks.[18] But it has been applied more broadly as well. For example, in *United States v. Kovel,*[19] the Second Circuit held that a client's communications with an accountant employed by his attorney were privileged where made for the purpose of enabling the attorney to understand the client's situation in order to provide legal advice.[20] In language pertinent here, Judge Friendly wrote:

> "What is vital to the privilege is that the communication be made in confidence

for the purpose of obtaining legal advice from the lawyer. If what is sought is not legal advice but only accounting service ... or if the advice sought is the accountant's rather than the lawyer's, no privilege exists. We recognize this draws what may seem to some a rather arbitrary line between a case where the client communicates first to his own accountant (no privilege as to such communications, even though he later consults his lawyer on the same matter ...) and others, where the client in the first instance consults a lawyer who retains an accountant as a listening post, or consults the lawyer with his own accountant present. But that is the inevitable consequence of having to reconcile the absence of a privilege for accountants and the effective operation of the privilege of a client and lawyer under conditions

mation provided to the lawyer by the client and professional advice given by an attorney that discloses such [confidential] information."); *Thurmond v. Compaq Computer Corp.,* 198 F.R.D. 475, 480–82 (E.D.Tex.2000) (cataloging cases applying privilege to communications from lawyer to client and noting divergence among federal courts concerning scope of such privilege); *Fed. Election Comm'n v. Christian Coalition,* 178 F.R.D. 61, 66 (E.D.Va.1998) ("The attorney-client privilege ... extends 'to protect communications by the lawyer to his client ... if those communications reveal confidential client communications.' ") (citing *United States v. Under Seal,* 748 F.2d 871, 874 (4th Cir.1984)); *Harmony Gold U.S.A., Inc. v. FASA Corp.,* 169 F.R.D. 113, 115 (N.D.Ill.1996) (stating that privilege applies to communications from a lawyer to a client provided "the legal advice given to the client, or sought by the client, [is] the predominant element in the communication"); *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.,* 160 F.R.D. 437, 441–42 (S.D.N.Y.1995) ("It is now well established that the privilege attaches ... to advice rendered by the attorney to the client, at least to the extent that such advice may reflect confidential information conveyed by the client."); *United States v. Int'l Bus. Mach. Corp.,* 66

F.R.D. 206, 212 (S.D.N.Y.1974) (privilege applies to communications by a lawyer to a client provided legal advice is the predominant feature of the communication). *Cf. Upjohn Co. v. United States,* 449 U.S. 383, 390, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981) (attorney-client privilege protects "giving of professional advice to those who can act on it"). *See generally* 24 Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5491 at 450–54 (1986 & Supp.2003) (noting variation among federal courts in breadth of application of privilege to communications by attorney to client).

17. *See* Sup.Ct. Std. 503(a)(3), 503(b), *reprinted in* 3 Joseph M. McLaughlin, Weinstein's Evidence § 503.01 (2d ed.2003) (hereinafter Weinstein) (privilege extends to appropriate communications between and among the client, the lawyer, and a "representative of the lawyer," which is defined as "one employed to assist the lawyer in the rendition of professional legal services.")

18. 3 Weinstein § 503.12[3][b].

19. 296 F.2d 918 (2d Cir.1961).

20. *Id.* at 922.

where the lawyer needs outside help." [21]

*Kovel* helps frame the analysis here. No one suggests that communications between Target and Firm would have been privileged if she simply had gone out and hired Firm as public relations counsel. On the other hand, there is no reason to question the stated rationale for her lawyers' hiring of Firm – that the lawyers viewed altering the mix of public information as serving Target's interests by creating a climate in which prosecutors and regulators might feel freer to act in ways less antagonistic to Target than otherwise might have been the case. Finally, the Court accepts that this was a situation in which the lawyers, in the words of *Kovel,* "need[ed] outside help," as they presumably were not skilled at public relations. The question therefore is whether the problem with which they "need[ed] outside help" related to their provision of what *Kovel* spoke of as "legal advice."

We begin with the obvious. Certainly Firm was not retained to help Target's lawyers understand technical matters to enable the lawyers to advise their client as to the requirements of the law, as was the case in *Kovel.* But it is common ground that the privilege extends to communications involving consultants used by lawyers to assist in performing tasks that go beyond advising a client as to the law. For example, a client's confidential communications to a non-testifying expert retained by the lawyer to assist the lawyer in preparing the client's case—essentially the situation in *Kovel* – probably are privileged. [22]

The government in any case concedes that consultants engaged by lawyers to advise them on matters such as whether the state of public opinion in a community makes a change of venue desirable, whether jurors from particular backgrounds are likely to be disposed favorably to the client, how a client should behave while testifying in order to impress jurors favorably and other matters routinely the stuff of jury and personal communication consultants come within the attorney-client privilege, as they have a close nexus to the attorney's role in advocating the client's cause before a court or other decision-making body. [23] The ultimate issue therefore resolves to whether attorney efforts to influence public opinion in order to advance the client's legal position—in this case by neutralizing what the attorneys perceived as a climate of opinion pressing prosecutors and regulators to act in ways adverse to Target's interests—are services, the rendition of which also should be facilitated by applying the privilege to relevant communications which have this as their object.

Traditionally, the proper role of lawyers vis-a-vis public opinion has been viewed rather narrowly, perhaps primarily out of concern that extra-judicial statements might prejudice jury pools. Codes of professional conduct, for example, traditionally have limited the extent to which lawyers properly may seek to influence public opinion by proscribing many types of extra-judicial statements concerning pending litigation. [24] More recently, however, there has been a strong tendency to view the

---

**21.** *Id.* (footnotes and citations omitted).

**22.** 3 WEINSTEIN § 503.12[5][b].

**23.** Tr., Apr. 30, 2003, at 4–7, 13–15.

**24.** *See generally* Jonathan M. Moses, *Legal Spin Control: Ethics and Advocacy in the Court of Public Opinion,* 95 COLUM. L.REV. 1811, 1816–25 (1995) (hereinafter *Spin Con-*

*trol* ); Beth A. Wilkinson & Steven H. Schulman, *When Talk Is Not Cheap: Communications With the Media, The Government and Other Parties in High Profile White Collar Criminal Cases,* 39 AM.CRIM. L.REV. 203, 205–06 (2001) (hereinafter *When Talk Is Not Cheap* ).

lawyer's role more broadly.[25] Nowhere is this trend more clearly recognized than in the plurality opinion by Mr. Justice Kennedy in *Gentile v. State Bar of Nevada,*[26] where he wrote for four justices:

"An attorney's duties do not begin inside the courtroom door. He or she cannot ignore the practical implications of a legal proceeding for the client. Just as an attorney may recommend a plea bargain or civil settlement to avoid the adverse consequences of a possible loss after trial, so too an attorney may take reasonable steps to defend a client's reputation and reduce the adverse consequences of indictment, especially in the face of a prosecution deemed unjust or commenced with improper motives. A defense attorney may pursue lawful strategies to obtain dismissal of an indictment or reduction of charges, including an attempt to demonstrate in the court of public opinion that the client does not deserve to be tried." [27]

And this statement does not stand alone. Indeed, many courts have compensated lawyers, in making fee awards under civil rights and other statutes, for public relations efforts in recognition of the importance of such work in the clients' interests.[28] But to say that lawyers in fact try

---

25. *E.g.,* Model Rules of Prof'l Conduct R. 3.6(c) (1999) (allowing lawyers to comment publicly to the extent necessary to neutralize publicity if the lawyer did not initiate the media attention); *Spin Control,* 95 Colum. L.Rev. at 1828–44; Julie R. O'Sullivan, *The Bakaly Debacle: The Role of the Press in High–Profile Criminal Investigations* in *Symposium, Bidding Adieu to the Clinton Administration: Assessing the Ramifications of the Clinton "Scandals" on the Office of the President and on Executive Branch Investigations,* 60 Md. L.Rev. 149, 169–82 (2001); S. Bennett, *Press Advocacy and the High–Profile Client,* 30 Loy. L.A.L.Rev. 13, 13–20 (1996); *see When Talk Is Not Cheap,* 39 Am.Crim. L.Rev. at 223.

26. 501 U.S. 1030, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991).

27. *Id.* at 1043, 111 S.Ct. 2720.

28. *See, e.g., Davis v. City and County of San Francisco,* 976 F.2d 1536, 1545 (9th Cir. 1992), *reh'g denied, vacated in part on other grounds, and remanded,* 984 F.2d 345 (9th Cir.1993) (affirming district court's award of compensation to prevailing party in civil rights action for attorneys' time spent giving press conferences and performing other public relations work where such work was "directly and intimately related to the successful representation of [the] client."); *Gilbrook v. City of Westminster,* 177 F.3d 839, 877 (9th Cir.1999) (affirming award to prevailing party in civil rights action for media and public relations activities and noting with approval the district court's finding that public rela-

tions work contributed directly and substantially to plaintiffs' litigation goals because " '[l]ocal politics had a potentially determinative influence on the outcome of settlement negotiations and the availability of certain remedies such as reinstatement' "); *Child v. Spillane,* 866 F.2d 691, 698 (4th Cir.1989) (Murnaghan, J., dissenting) (stating that public relations work should be compensated as attorney's fees in exceptional cases "involving issues of such vital public concern that lawyers will find it necessary to spend time responding to reporters' questions"); *United States v. Aisenberg,* 247 F.Supp.2d 1272, 1316 (M.D.Fla.2003) (awarding fees for public relations services and noting that it was appropriate for counsel for suspects in missing child investigation, "consistent with the rules governing professional conduct, not only to procure the assistance of the public in locating the child but to present a public response, to nurture the clients' diminished public image, and *thereby to reduce public pressure on the prosecution to indict"*) (emphasis added). *But see, e.g., Rum Creek Coal Sales, Inc. v. Caperton,* 31 F.3d 169, 176 (4th Cir.1994) (affirming disallowance of attorneys' fees under 42 U.S.C. § 1988 for prevailing party for public relations efforts aimed "not at achieving litigation goals, but at minimizing the inevitable public relations damage to the company for suing the governor and the state police to alter the pro-labor police enforcement policies."); *New York State Ass'n of Career Sch. v. State Educ. Dep't,* 762 F.Supp. 1124, 1127 (S.D.N.Y.1991) ("Plaintiffs' direct effect on the legislative process … appears to

to influence public opinion in the interests of their clients—indeed, to say that they properly may do so and, on occasion, are compensated by courts for such services does not alone answer the question before the Court.

The Court's attention has been drawn to two cases that deal in some respect with the issue of public relations services in the privilege context, *Calvin Klein Trademark Trust v. Wachner* [29] and *In re Copper Market Antitrust Litigation.* [30] Both merit study.

In *Calvin Klein,* the plaintiffs' attorneys hired a public relations firm in anticipation of filing what promised to be a high profile civil suit against a licensee and its well known chief executive. They contended that the purpose was defensive, viz. to assist the lawyers in understanding the possible reaction of the plaintiffs' various constituencies to the litigation, rendering legal advice, and ensuring that media interest in the action would be dealt with responsibly. [31] And they subsequently invoked the attorney-client privilege and work product in an effort to block document production by the public relations firm and one of its employees.

Judge Rakoff rejected the attorney-client privilege claim on three grounds. First, after reviewing the documents, he concluded that few if any of them "contain or reveal confidential communications from the underlying client … made for the purpose of obtaining legal advice." [32] Sec-

ond, the evidence showed that the public relations firm—which had a preexisting relationship with the plaintiffs—was "simply providing ordinary public relations advice so far as the documents … in question [were] concerned." [33] Finally, he found no justification for broadening the privilege to cover functions not "materially different from those that any ordinary public relations firm would have performed if they had been hired directly by [the plaintiffs] (as they also were), instead of by [their] counsel." [34]

In *Copper Antitrust,* a foreign company, Sumitomo, that found itself in the midst of a high profile scandal involving both regulatory and civil litigation aspects hired a public relations firm because it lacked experience in dealing with Western media. [35] The public relations firm acted as Sumitomo's spokesperson when dealing with the Western press and conferred frequently with the company's U.S. litigation counsel, preparing drafts of press releases and other materials which incorporated the lawyers' advice. [36] When an adversary served a subpoena calling upon the public relations firm to produce all documents relating to its work for Sumitomo, Sumitomo resisted on attorney-client privilege and work product grounds. [37] Judge Swain upheld the attorney-client privilege claim, reasoning that the public relations firm, in the circumstances of this case, was the functional equivalent of an in-house department of Sumitomo and thus part of the

---

have been the result of lobbying pressure, and thus an award of attorney's fees is clearly not warranted on that basis.'')

29. 198 F.R.D. 53 (S.D.N.Y.2000).

30. 200 F.R.D. 213 (S.D.N.Y.2001).

31. 198 F.R.D. at 54.

32. *Id.*

33. *Id.*

34. *Id.* at 55.

35. 200 F.R.D. at 215.

36. *Id.* at 215–16.

37. *Id.* at 216.

"client."[38] The communications between the firm and the lawyers, she held, therefore were confidential attorney-client interactions.

Although *Calvin Klein* and *Copper Antitrust* both involved situations somewhat analogous to this case, neither resolves the attorney-client privilege problem here. *Copper Antitrust* disposed of the privilege issue by concluding that the public relations firm in substance was part of the client whereas Target makes no similar assertion. *Calvin Klein* was somewhat different from this case because the public relations firm there had a relationship with the client that antedated the litigation, the client was a corporation addressing an array of constituencies including customers and shareholders, and the public relations firm, in Judge Rakoff's words, was "simply providing ordinary public relations advice."[39] Perhaps even more significant, *Calvin Klein*, no doubt in consequence of the arguments made in that case, assumed an answer to the issue now before this Court—whether a lawyer's public advocacy on behalf of the client is a professional legal service that warrants extension of the privilege to confidential communications between and among the client, the lawyer, and any public relations consultant the lawyer may engage to advise on the performance of that function. Answering that question requires consideration of the policies that inform the attorney-client privilege.

As the Supreme Court said in *Upjohn Co. v. United States*,[40] the purpose of the privilege "is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice."[41] In this case, construing the privilege to cover the communications involving the public relations consultants would not materially serve the purpose of promoting observance of law for the simple reason that the current controversy concerns the consequences of Target's past conduct, not an effort to conform her present and future

---

**38.** *Id.* at 219.

**39.** 198 F.R.D. at 54.

The distinction should not be exaggerated. While Witness describes the nature of Firm's engagement as attempting to influence opinion purely for the impact of a more favorable environment on prosecutors and regulators, and the Court does not question her good faith, it would be naive to suppose that the effect of Firm's services or, for that matter, Target's motive in agreeing to pay for them, is so unidimensional. Target is a prominent and, according to press reports, relatively young business person. Whatever the outcome of her present legal exposures, she will have a social and, in all likelihood, business life in the future, both of which stand to be affected by public perceptions of her and her conduct while at the Company. Hence, while the Court assumes that Target's chief concern at the time of these communications was to avoid or limit the scope of any indictment and other legal attacks upon her, Firm's engagement, to the extent it succeeds, is likely to have benefits for Target outside the litigation sphere.

**40.** 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981).

**41.** *Id.* at 389, 101 S.Ct. 677.

This reflects a change in the generally accepted view of the privilege's purpose. The privilege, at its inception, belonged to the attorney and was grounded in humanistic considerations, e.g., that it enabled the attorney "to comply with his code of honor and professional ethics." EDWARD J. IMWINKELRIED, THE NEW WIGMORE: EVIDENTIARY PRIVILEGES § 2.3, at 108 (2002); 8 JOHN HENRY WIGMORE, EVIDENCE § 2290 (McNaughton rev.1961); *see also In re Colton*, 201 F.Supp. 13, 15 (S.D.N.Y.1961), *aff'd*, 306 F.2d 633 (2d Cir.1962), *cert. denied*, 371 U.S. 951, 83 S.Ct. 505, 9 L.Ed.2d 499 (1963). Some have advocated a heavier reliance on such considerations in determining the scope of the privilege today. *See, e.g.,* IMWINKELRIED § 5.3.

actions to the law's requirements. If justification is to be found for such a construction, it must lie in the proposition that encouraging frank communication among client, lawyers, and public relations consultants enhances the administration of justice.

Target, like any investigatory target or criminal defendant, is confronted with the broad power of the government. Without suggesting any impropriety, the Court is well aware that the media, prosecutors, and law enforcement personnel in cases like this often engage in activities that color public opinion, certainly to the detriment of the subject's general reputation but also, in the most extreme cases, to the detriment of his or her ability to obtain a fair trial. Moreover, it would be unreasonable to suppose that no prosecutor ever is influenced by an assessment of public opinion in deciding whether to bring criminal charges, as opposed to declining prosecution or leaving matters to civil enforcement proceedings, or in deciding what particular offenses to charge, decisions often of great consequence in this Sentencing Guidelines era. Thus, in some circumstances, the advocacy of a client's case in the public forum will be important to the client's ability to achieve a fair and just result in pending or threatened litigation.

Nor may such advocacy prudently be conducted in disregard of its potential legal ramifications. Questions such as whether the client should speak to the media at all, whether to do so directly or through representatives, whether and to what extent to comment on specific allegations, and a host of others can be decided

without careful legal input only at the client's extreme peril.[42] Indeed, in at least one case, the Securities and Exchange Commission ("SEC") charged that a company that was the subject of an investigation violated the securities laws because its public statements concerning the pending investigation were misleading.[43]

Finally, dealing with the media in a high profile case probably is not a matter for amateurs. Target and her lawyers cannot be faulted for concluding that professional public relations advice was needed.

This Court is persuaded that the ability of lawyers to perform some of their most fundamental client functions—such as (a) advising the client of the legal risks of speaking publicly and of the likely legal impact of possible alternative expressions, (b) seeking to avoid or narrow charges brought against the client, and (c) zealously seeking acquittal or vindication—would be undermined seriously if lawyers were not able to engage in frank discussions of facts and strategies with the lawyers' public relations consultants. For example, lawyers may need skilled advice as to whether and how possible statements to the press—ranging from "no comment" to detailed factual presentations—likely would be reported in order to advise a client as to whether the making of particular statements would be in the client's legal interest. And there simply is no practical way for such discussions to occur with the public relations consultants if the lawyers were not able to inform the consultants of at least some non-public facts, as well as the lawyers' defense strategies and tactics, free of the fear that the con-

---

42. *See, e.g., Spin Control,* 95 Colum. L.Rev. at 1828–42; Bennett, *Press Advocacy and the High-Profile Client,* 30 Loy. L.A. L.Rev. at 18–20; *When Talk Is Not Cheap,* 39 Am.Crim. L.Rev. at 203–14.

43. *In re Incomnet, Inc.,* Exchange Act of 1934 Release No. 40281, 1998 WL 429063, at *6, 1998 SEC Lexis 1614, at *12, *17 (July 30, 1998) (allegedly misleading press statements "essentially denied the Commission's investigation").

sultants could be forced to disclose those discussions. In consequence, this Court holds that (1) confidential communications (2) between lawyers and public relations consultants (3) hired by the lawyers to assist them in dealing with the media in cases such as this (4) that are made for the purpose of giving or receiving advice (5) directed at handling the client's legal problems are protected by the attorney-client privilege. Two points remain however.

As previously noted, Target would not have enjoyed any privilege for her own communications with Firm if she had hired Firm directly, even if her object in doing so had been purely to affect her legal situation. There is a certain artificiality, therefore, in saying that the privilege applies where the lawyers do the hiring and the other requirements alluded to above are satisfied. The justification, however, is found in Judge Friendly's opinion in *Kovel:* "[T]hat is the inevitable consequence of having to reconcile the absence of a privilege for accountants and the effective operation of the privilege of a client and lawyer under conditions where the lawyer needs outside help."[44] Precisely the same rationale applies here.

 The second remaining issue is the question of Target's communications with the consultants, some of which took place in the presence of the lawyers while others were strictly between Target and Firm. The Court is of the view that both types of communications are covered by the privilege provided the communications were directed at giving or obtaining legal advice. Indeed, in *Kovel,* the Second Circuit recognized that it would be mere formalism to extend the privilege in the former scenario

but not the latter, provided the purpose of the confidential communication was to obtain legal advice:

> "[I]f the lawyer has directed the client, either in the specific case or generally, to tell his story in the first instance to an accountant engaged by the lawyer, who is then to interpret it so that the lawyer may better give legal advice, communications by the client reasonably related to that purpose ought fall within the privilege; there can be no more virtue in requiring the lawyer to sit by while the client pursues these possibly tedious preliminary conversations with the accountant than in insisting on the lawyer's physical presence while the client dictates a statement to the lawyer's secretary or is interviewed by a clerk not yet admitted to practice. What is vital to the privilege is that the communication be made in confidence for the purpose of obtaining legal advice from the lawyer."[45]

 Witness testified before the grand jury that she recalled only two conversations with Target alone and described their general subject matter.[46] One conversation took place on a day on which there had been substantial media coverage, and Target asked Witness for her view of the coverage.[47] The other concerned a problem with a wire service story.[48] Furthermore, one of the documents the Court reviewed *in camera* is an e-mail from Witness to Target alone concerning a *Wall Street Journal* posting.[49]

Neither of the conversations satisfies the standard set forth above—that the communication be made for the purpose of

---

44. *Kovel,* 296 F.2d at 922.

45. *Kovel,* 296 F.2d at 922.

46. Grand Jury Tr., May 5, 2003, at 30–31.

47. *Id.* at 31.

48. *Id.*

49. Target Priv. 0011.

obtaining legal services. Target has not shown that either conversation was at the behest of her lawyers or directed at helping the lawyers formulate their strategy.

This Court previously held that a portion of the Target–Witness e-mail is opinion work product.[50] The balance, however, is not covered by the attorney-client privilege because there has been no showing that it has a nexus sufficiently close to the provision or receipt of legal advice. Thus, neither these two conversations nor the non-highlighted portion of the e-mail is protected by the attorney-client privilege. On the other hand, Target's communications with Firm personnel alone, or with both the lawyers and Firm personnel, are privileged to the extent the conversations were related to the provision of legal services.[51]

In sum, then, the Court sustains the attorney-client privilege objections to questions seeking the content of oral communications among Firm, Target and her lawyers, or any combination thereof, which satisfy the standard enumerated above. It overrules the claim of privilege as to the two conversations described in the preceding paragraph.

As all of the documents withheld from production by Firm are communications among Target, her lawyers and Firm, or some combination thereof, for the purpose of giving or receiving legal advice, except for the previously mentioned e-mail from Witness to Target, the Court sustains the attorney-client privilege objections to production of those documents.

## B. Work Product

The Court recognizes the possibility that a reviewing court may come to a different conclusion with respect to the attorney-client privilege issue. Accordingly, it deals with the work product objections to the extent they have not been sustained in the May 1, 2003 order.

"The work product doctrine, now codified in part in Rule 26(b)(3) of the Federal Rules of Civil Procedure and Rule 16(b)(2) of the Federal Rules of Criminal Procedure, provides qualified protection for materials prepared by or at the behest of counsel in anticipation of litigation or for trial."[52] Both "distinct from and broader than the attorney-client privilege,"[53] the work product doctrine "is intended to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation,' free from unnecessary intrusion by his adversaries."[54]

 Work product falls generally into two categories, which are afforded differ-

**50.** Order, *In re Grand Jury Subpoenas Dated March 24, 2003,* May 1, 2003.

**51.** That Target's spouse was present during some of these conversations does not destroy any applicable privilege. *See, e.g., Murray v. Board of Educ.,* 199 F.R.D. 154, 155 (S.D.N.Y. 2001) ("disclosure of communications protected by the attorney-client privilege within the context of another privilege does not constitute waiver of the attorney-client privilege"); *Solomon v. Scientific American, Inc.,* 125 F.R.D. 34, 36 (S.D.N.Y.1988) (no waiver of the attorney-client privilege when privileged information was disclosed to client's wife); *see also* 3 WEINSTEIN § 511.07 ("There is no waiver when the disclosure is made in another communication that is itself privileged.")

**52.** *In re Grand Jury Subpoenas Dated March 19, 2002 and August 2, 2002,* 318 F.3d 379, 383 (2d Cir.2003).

**53.** *United States v. Nobles,* 422 U.S. 225, 238 n. 11, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975).

**54.** *United States v. Adlman,* 134 F.3d 1194, 1196 (2d Cir.1998) (quoting *Hickman v. Taylor,* 329 U.S. 495, 511, 67 S.Ct. 385, 91 L.Ed. 451 (1947)).

ent levels of protection. Work product consisting merely of materials prepared in anticipation of litigation or for trial is discoverable "only upon a showing that the party seeking discovery has substantial need of the materials ... and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means."[55] Opinion work product—materials that would reveal the "mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation"[56]—is discoverable, if at all, only upon a significantly stronger showing.[57]

In this case, Firm withheld nineteen documents from production based in whole or in part on the contention that they are protected work product. The government's initial response was to claim that the documents are not work product because the government seeks no "materials that reveal Target's attorneys' mental impressions" and, should the Court conclude otherwise, that it is prepared to make an *ex parte* showing of substantial need.[58] At oral argument, moreover, the government disavowed any effort to obtain production of documents containing attorney opinion work product, stating that its interest is limited to obtaining facts.[59] Accordingly, the Court sustained the work product ob-

jection to such portions of the documents in its May 1, 2003 order. There remains for consideration the question whether the remaining portions of the documents are protected and, if so, whether the government has made or should be permitted to seek to make an *ex parte* showing of substantial need.[60]

There is no serious question that the remaining portions of the documents withheld are work product, as the government does not dispute that they were prepared in anticipation of litigation. If doubt there were, it would have been eliminated both by the Court's *in camera* review, which confirms that all of the nineteen documents in fact were prepared in anticipation of litigation, and by *Calvin Klein* and *Copper Antitrust*, both of which held that work product protection covers similar materials in circumstances which, for this purpose, were analogous.[61]

The government implicitly concedes that it has not shown substantial need for the non-opinion work product portions of the documents, requesting instead that it be permitted to attempt such a showing *ex parte*.[62] While *ex parte* proceedings in most circumstances are strongly disfavored by our system, the public interest in grand jury secrecy in some cases may trump that important principle. "[W]here an *in camera* submission is the only way

---

**55.** FED. R. CIV. P. 26(b)(3).

In criminal cases, the doctrine is even stricter, precluding discovery of documents made by a defendant's attorney or the attorney's agents except with respect to "scientific or medical reports." FED. R.CRIM. P. 16(b)(2).

**56.** FED. R. CIV. P. 26(b)(3).

**57.** *See, e.g., Upjohn Co.,* 449 U.S. at 400–02, 101 S.Ct. 677; *In re Grand Jury Proceedings,* 219 F.3d 175, 190–91 (2d Cir.2000); *Adlman,* 134 F.3d at 1204.

**58.** Letter, Assistant United States Attorneys, Apr. 24, 2003, at 11–12; *see also* Letter, Assis-

tant United States Attorneys, Apr. 29, 2003, at 6–7.

**59.** Tr., Apr. 30, 2003, at 33.

**60.** The Court for convenience uses "substantial need" to refer to the entire requisite showing of substantial need and undue hardship.

**61.** *Calvin Klein,* 198 F.R.D. at 55–56; *Copper Antitrust,* 200 F.R.D. at 220–21.

**62.** Letter, Assistant United States Attorneys, Apr. 24, 2003, at 12.

to resolve an issue without compromising a legitimate need to preserve the secrecy of the grand jury, it is an appropriate procedure." [63]

This proposition creates something of a chicken-and-egg problem. When the Court pressed the government to explain how making a showing of substantial need in the presence of its adversary would prejudice grand jury secrecy, the government indicated that it feared that it could not do so "in open court without letting the cat out of the bag, so to speak" and acknowledged that this is "[s]omewhat of a Catch 22." [64]

 In the absence of any non-conclusory showing that an explanation of the need for an *ex parte* submission itself would compromise grand jury secrecy, there are two obvious alternatives. One is simply to take the government at its word and unconditionally permit an *ex parte* showing. The other is to deny this aspect of the government's motion. But the choice before the Court need not be so stark. The middle ground is to allow the government to make an *ex parte* showing both of substantial need and of the necessity of preserving the confidentiality of its submission in order to protect grand jury secrecy. If the Court concludes that disclosure of the submission would not compromise grand jury secrecy, the government's submission will be disclosed to Target's counsel, who will be permitted to respond before the Court decides whether the government has shown substantial need for the non-opinion work product. If it does not so conclude, it will proceed directly to rule on the sufficiency of the government's showing of need.

### III. Conclusion

For the foregoing reasons, the government's motion is granted to the following extent:

1. Witness shall testify further pursuant to the subpoena served upon her and answer all questions relating to the two conversations she recalls having had with Target alone and such other questions as may be put to her in respect of which there is no claim of privilege consistent with this opinion.

2. The government, on or before May 21, 2003, may make an *ex parte* submission as to both its claimed need for the non-attorney opinion work product portions of the withheld Firm documents and the necessity of preserving the confidentiality of its submission in order to protect grand jury secrecy. Any such submission shall be accompanied by a memorandum of law, served on Target's counsel, addressing the question whether the Court should apply Civil Rule 26(b)(3), Criminal Rule 16(b)(2), or some other standard in ruling on the government's motion.[65]

SO ORDERED.

**63.** *In re John Doe, Inc.*, 13 F.3d 633, 636 (2d Cir.1994); *accord In re Marc Rich & Co.*, 707 F.2d 663, 670 (2d Cir.), *cert. denied*, 463 U.S. 1215, 103 S.Ct. 3555, 77 L.Ed.2d 1400 (1983); *In re Grand Jury Subpoena dated August 9, 2000*, 218 F.Supp.2d 544, 551 (S.D.N.Y.2002), *aff'd*, 318 F.3d 379 (2d Cir. 2003).

**64.** Tr., Apr. 30, 2003, at 35.

**65.** No such submission was made.